DE LA FAYETTE WILCOX, PLAINTIFF IN ERROR, *vs.* JOHN JACKSON, ON THE DEMISE OF MURRAY M'CONNEL, DEFENDANT IN ERROR.

Ejectment for a tract of land in Cook county, Illinois, being a fractional section, embracing the military post called Fort Dearborn, at the time of the institution of the suit; in the possession of the defendant as the commanding officer of the United States. The post was established in 1804, and was occupied by the troops of the United States until August 16th, 1812, when the troops were massacred, and the fort taken by the enemy. It was reoccupied by the United States in 1816, and continued to be so held until May, 1823, during which time some factory houses, for the use of the Indian department, were erected on it. It was evacuated by order of the war department in 1823, and was, by order of the department, again occupied by troops in 1828, as one of the military posts of the United States; was again evacuated in 1831, the government having authorized a person to take and keep possession of it. It was again occupied by troops of the United States, in 1832, and continued so to be at the commencement of this suit, being generally known at Chicago to be occupied as a military post of the United States. The buildings about the garrison were not sold in 1831, when it was evacuated; although a great part of the movable property in and about it, was sold. In 1817, Beaubean bought of an army contractor, for one thousand dollars, a house built on the land. There was attached to the house an enclosure, occupied as a garden or field, of which Beaubean continued in possession until 1836. In 1823, the factory houses on the land were sold by order of the Secretary of War, and were bought by Beaubean, for five hundred dollars. Of these he ʳ ᵒk possession, and continued to occupy them, and to cultivate the land, without interruption by the United States, until the commencement of this suit. The United States, in May, 1834, built a lighthouse on the land, and have kept twenty acres enclosed and cultivated. The land was surveyed by the government of the United States, in 1821; and in 1824, at the instance of the Indian agent at Chicago, the Secretary of War requested the commissioner of the general land office to reserve this land for the accommodation and protection of the property of the Indian agency; who, in 1821, informed the Secretary of War that he had directed this section of land to be reserved from sale, for military purposes. In May, 1831, Beaubean claimed this land, at the land office in Palestine, for pre-emption. This claim was rejected, and, by the commissioner of the land office, he was, in February, 1832, informed that the land was reserved for military purposes. This information was also given to others who applied on his behalf. In 1834, he applied for this land to the office in Danville, and his application was rejected. In 1835, Beaubean applied for the land to the land office at Chicago, when his claim to pre-emption was allowed; and he paid the purchase money, and procured the register's certificate. Beaubean sold and conveyed his interest to the plaintiff in the ejectment. Held, that Beaubean acquired no title to the land by his entry; and that the right of the United States to the land was not divested or affected by the entry at the land office at Chicago; or by any of the previous acts of Beaubean.

The decision of the Register and Receiver of a land office, in the absence of fraud, would be conclusive as to the facts that the applicant for the land was then in possession, and of his cultivating the land during the preceding year; because these questions are directly submitted to those officers. Yet, if they undertake to grant pre-emptions to land, on which the law declares they shall not be granted; then they are acting upon a subject matter clearly not within their jurisdiction; as much so as if a Court, whose jurisdiction was declared not to extend beyond a given sum, should attempt cognizance of a case beyond that sum.

Appropriation of land by the government is nothing more or less than setting it apart for some particular use. In the case before the Court, there has been an appropriation of the land, not only in fact, but in law; for a military post; for an Indian agency; and for the erection of a lighthouse.

By the act of Congress of 1830, all lands are exempted from pre-emption which are reserved from sale by order of the President of the United States. The President speaks and acts through the heads of the several departments, in relation to subjects which appertain to their respective duties. Both military posts, and Indian affairs, including agencies, belong to the war department. A reservation of lands, made at the request of the

[Wilcox *vs.* Jackson.]

Secretary of War, for purposes in his department, must be considered as made by the President of the United States within the terms of the act of Congress.

Whensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands: and no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it: although no other reservation were made of it.

The right of pre-emption was a bounty extended to settlers and occupants of the public domain. This bounty, it cannot be supposed, was designed to be extended to the sacrifice of public establishments, or of great public interests.

Nothing passes a perfect title to public lands, with the exception of a few cases, but a patent. The exceptions are, where Congress grants lands, in words of present grant. The general rule applies as well to pre-emptions as to other purchases of public lands.

The act of the legislature of Illinois, giving a right to the holder of a register's certificate of the entry of public lands to recover possession of such lands in an action of ejectment, does not apply to cases where a paramount title to the lands is in the hands of the defendant, or of those he represents. The exception in the law of Illinois, applies to, cases in which the United States have not parted with the title to the land, by granting a patent for it.

A state has a perfect right to legislate as she may please in regard to the remedies to be prosecuted in her Courts; and to regulate the disposition of the property of her citizens, by descent, devise, or alienation. But Congress are invested, by the Constitution, with the power of disposing of the public land, and making needful rules and regulations respecting it.

Where a patent has not been issued for a part of the public lands, a state has no power to declare any title, less than a patent, valid against a claim of the United States to the land; or against a title held under a patent granted by the United States.

Whenever the question in any Court, state or federal, is, whether the title to property which had belonged to the United States has passed, that question must be resolved by the laws of the United States. But whenever the property has passed, according to those laws, then the property, like all other in the state, is subject to state legislation; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States.

Every tribunal acting judicially, whilst acting within the sphere of its jurisdiction, where no appellate tribunal is created, its judgment is final; and even where there is such an appellate power, their judgment is conclusive where it only comes collaterally in question; so long as it is unreversed. But directly the reverse is true, in relation to the judgment of any Court, acting beyond the pale of its authority. This principle is concisely and accurately stated by this Court in the case of Elliot and others *vs.* Peirsol and others. 1 Peters, 340.

ERROR to the Superior Court of the state of Illinois.

In the Circuit Court of Cook county, in the state of Illinois, an action of ejectment was commenced in February, 1836, by John Jackson, on the demise of Murray M'Connel, against De la Fayette Wilcox, for the recovery of a part of the military post of Fort Dearborn, at Chicago, in the state of Illinois; the defendant being then in possession of the premises as the commander of the post. The defendant appeared; and after the usual pleadings, the cause was brought to trial in October, 1836, and submitted to the Court on an agreed statement of facts, which was to be taken as if found as a special verdict.

The premises sued for are part of fractional section 10, in township 39, north of range 14, east of the third principal meridian, in the county of Cook, and state of Illinois; and embrace the military post called Fort Dearborn, of which post, at the time of the bringing of this suit, and the service of the declaration therein, the said defendant, De la Fayette Wilcox, was in the possession of the

said premises, and was the commanding officer under the authority of the United States; which post was established by the United States in 1804, and was thereafter occupied by the troops of the United States till August 16, 1812, when the troops were massacred, and the post taken by the enemies of the country. It was reoccupied by the troops on the 4th of July, 1816; in which year the United States caused to be built upon the fractional section, No. 10, T. 39, N. R. 14 east, some factory houses for the use of the Indian department. The troops continued to occupy the post until the month of May, 1823, when it was evacuated by order of the government, and was left in possession of Dr. A. Wolcott, Indian agent at Chicago.

On the 19th of August, in the year 1828, the military post was again occupied by the troops of the government, acting under the order of the Secretary of War, as one of the military posts of the United States. The post was again evacuated by the troops of the government in the month of May, 1831, though the government never gave up the possession of the military post, called Fort Dearborn; but left the same in the possession of one Oliver Newberry, who authorized George Dole to take and keep the same in repair; which said Dole accordingly did. Said post was again occupied by the troops of the government in June, 1832, under the command of Major Whistler, an office in the army of the United States. At the time Major Whistler took possession, being at the time of the war with the Sock and Fox Indians, several hundred persons were in the fort for security against the Indians. The military post has been occupied by the troops, and was generally known at Chicago to be so occupied from that date up to the commencement of this suit, and is still used for that purpose.

When the military post was evacuated in 1831, the quartermaster at the post, acting under orders, sold a greater part of the movable property, in and about the garrison, belonging to the government, but sold none of the buildings belonging to the military post.

In the year 1817, John Baptiste Beaubean bought of one John Dean, who was an army contractor at the post, a house built upon said land, by the said Dean, and gave him therefor one thousand dollars; attached to the house was an enclosure used and occupied by said Dean, as a garden and field, and Mr. Beaubean then took possession of the house and enclosure, and continued in possession, cultivating a part of the enclosure every year, from the year 1817 to the 17th of June, 1836.

In 1823, the factory houses built at the post upon the tract of land, were by order of the Secretary of the Treasury sold, and Capt. Henry Whiting became the purchaser thereof. In the same year Whiting sold said improvements to the American Fur Company, and the company for the sum of five hundred dollars sold to said Beaubean, who took possession thereof, and continued to occupy the same, together with a part of the quarter section of land, to the

date of the commencement of this suit. Mr. Beaubean continued to occupy said houses and enclosure upon the land, and to cultivate a part of the land unmolested and undisturbed by any person whatever, from the year 1817 up to the day of the commencement of this suit.

The land in question was surveyed by the government in the year 1821.

Since the military post was reoccupied by the United States troops in 1832, as before stated, to wit, before the first day of May, 1834, the United States built a lighthouse upon part of the land, and have kept constantly enclosed and cultivated for the use of the said garrison at least twenty acres of said land. The United States troops, by order and consent of the government, have also used and occupied various other government lands near and adjoining the quarter section of land.

On the 2d of September, 1824, Dr. A. Wolcott, Indian agent, then stationed at Chicago, wrote the following letter to the Secretary of War of the United States, to wit:

*"Fort Dearborn, Chicago, Sept. 2,* 1824.

" Sir : I have the honour to suggest to your consideration the propriety of making a reservation of this post and the fraction on which it is situated, for the use of this agency. It is very convenient for that purpose, as the quarters afford sufficient accommodation for all the persons in the employ of the agency, and the storehouses are safe and commodious places for the provisions and other property that may be in charge of the agent. The buildings and other property, by being in possession of a public officer, will be preserved for public use, should it ever be necessary to occupy them again with a military force.

As to the size of the fraction I am not certain, but I think it contains about sixty acres; a considerable greater tract than that is under fence; but that would be abundantly sufficient for the use of, the agency, and contains all the buildings attached to the fort, such as a mill, barn, stable, &c. which it would be desirable to preserve.

I have the honour to be, &c., ALEXANDER WOLCOTT, Jun.,
HON. J. C. CALHOUN, *Secretary of War.* *Indian Agent."*

Which letter John C. Calhoun, then Secretary of War of the United States, on the 30th of September, 1824, enclosed with the following note to George Graham, Esq., Commissioner of the General Land Office of the United States.

*"Department of War,* 30*th Sept.* 1824.

" Sir : I enclose herewith a copy of a letter from Dr. Wolcott, Indian agent at Chicago, and request you will direct a reservation to be made for the use of the Indian department at that post, agreeably to his suggestions. I have the honour to be, &c.

GEORGE GRAHAM, Esq., J. C. CALHOUN.
*Commissioner of the General Land Office, Treasury Department."*

And thereupon, on the first day of October, 1824, George Graham, then commissioner of the land office, addressed a letter in reply to the Secretary of War, at the same time subjoining to the letter of the said Secretary of War, this note, to wit: "Answered the first of October, 1824, and the frac. Sec. 10, T. 39, N. R. 14 E. coloured and marked on the map, as reserved for military purposes."

The letter in reply is as follows, to wit:

*"General Land Office, 1st of October,* 1824.

" Sir: In compliance with your request, I have directed that the fractional section 10, Township 39, N. R. 14 E., containing 57·50 acres, and within which Fort Dearborn is situated, should be reserved from sale for military purposes. I am, &c.    GEORGE GRAHAM.

Hon. J. C. CALHOUN, *Secretary of War."*

Which fractional section, mentioned in the foregoing letter of George Graham, embraces the premises sued for, and Fort Dearborn, occupied by the United States as aforesaid.

After the writing and receipt of the letters aforesaid, to wit, on the 29th day of May, 1830, Congress passsed a law granting the right of pre-emption upon the public lands to every person who cultivated any part of a quarter section of said land in 1829, and was in the actual possession thereof on the 29th day of May, 1830; but which pre-emption right does not extend to any land which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatsoever, or for the use of the United States, or either of the states in which any of the public lands may be situated. Mr. Beaubean having cultivated a part of F section in 1829, and having been in possession of a part so cultivated on the 29th day of May, 1830; on the 7th day of May, 1831, made application to the Register and Receiver of the United States land office at Palestine, in Illinois, and offered to prove a pre-emption upon the land, and purchase the same at private sale, under the pre-emption law, which claim of pre-emption upon the land was not by the Register and Receiver at Palestine allowed to Mr. Beaubean.

One Robert Kenzie, on the 7th day of May, 1831, made application to the Register and Receiver of the land office, to be allowed to enter at private sale a part of the same fractional section 10; and the claim by the said Register and Receiver was then passed and allowed, and Robert Kenzie was then permitted to enter at private sale, under pre-emption law, the north fraction of fractional section ten.

After the application of Mr. Beaubean to the Register and Receiver at Palestine as aforesaid, to wit, on the 7th and 12th of May, 1831, Joseph Kitchell, then Register of the land office, addressed letters to Elijah Hayward, Esq., then Commissioner of the General Land Office of the United States, informing him of the application of the said Beaubean to enter said S. W. F section 10,

town 39, north of range 14 east, under the pre-emption act; and on the 2d of November, 1831, Mr. Beaubean addressed a letter to the said Hayward, commissioner, &c., stating that in the month of May preceding he had filed in the office at Palestine aforesaid, proof of his right of pre-emption to the land, and insisting that he was entitled to have the claim allowed; and in answer thereto was informed by the commissioner by letter, dated the 2d of February, 1832, that said south-west quarter of said fractional section ten, T. 39, N. R. 14 E. was reserved for military purposes. On the 1st of October, 1824, several other persons, in behalf of said Beaubean, after his application as aforesaid, prior to the said 2d of February, 1832, made inquiry by letter of said commissioner touching the same, and were informed by the commissioner that the tract of land had been reserved for military purposes, and said Beaubean's application as aforesaid was rejected.

Afterwards, to wit, on the 19th day of June, 1834, Congress passed an act to revive the pre-emption law of the 29th of May, 1830, by the first section of which act is provided that every settler or occupant of the public lands prior to the passage of this act, who is now in possession, and cultivated any part thereof in 1833, shall be entitled to all the benefits and privileges of the act entitled an act to grant pre-emption rights to settlers on public lands, approved 29th May, 1830, and the act is hereby revived, and shall continue in force two years from the passage of this act and no longer; and Mr. Beaubean having cultivated a part of the fractional quarter of section ten in 1833, and having been in the actual possession and occupancy of the part, so by him cultivated, on the 19th day of June, 1834, the date of the passage of the last recited law, did, in the month of July, 1834, apply to the Register and Receiver of the United States land office at Danville, in Illinois, for leave to prove a pre-emption, and enter the fractional quarter under the last recited act; which application and claim of Beaubean was rejected by the said Register and Receiver at Danville aforesaid, who informed Beaubean that said land was reserved for military purposes.

After the writing of the letters by Dr. Wolcott, Indian agent, and J. C. Calhoun, Secretary of War, and George Graham, Commissioner of the General Land Office, herein before referred to and set forth, to wit, on the 26th day of June, 1834, Congress by a law approved upon that day created two additional land districts in Illinois; one called north-west and the other the north-east land districts of the state of Illinois, and the last mentioned district includes the land in controversy.

By the fourth section of said act it is provided that the President shall be authorized, so soon as the survey shall be completed, " to cause to be offered for sale, in the manner prescribed by law, all the lands lying in said land district at the land offices, in the respective districts in which the lands so offered is embraced; reserving only section sixteen in each township, the tract reserved for the village of Galena; such other tracts as have been granted to individuals.

and the state of Illinois, and such reservation as the President shall deem necessary to retain for military posts; any law of Congress heretofore existing to the contrary notwithstanding."

It is further provided by said act, that there "shall be established in each of said land districts a land office at such time and place as the President may deem necessary;" and that a land office was established in said north-east land district before the 1st of May, 1835, which is the land office at Chicago.

After the passage of the act, and after the land office aforesaid was established, the President of the United States, on the 12th day of February, 1835, made and published his proclamation directing various lands in said north-eastern land district to be sold at said land office at Chicago. Among said lands so proclaimed for sale, is the said fractional section 10, in town 39, N. R. 14 E. unless the same is excepted by the general exception in said proclamation, in the words following, to wit: "The lands reserved by law for the use of schools, and for other purposes, will be excluded from the sale."

The lands were directed by the proclamation to be sold at Chicago land office aforesaid, on the 15th day of June, 1835, and before the said 15th day of June, to wit, in the month of April, 1835, the Commissioner of the General Land Office caused to be transmitted to said land office at Chicago the extended plat of the land in the said proclamation mentioned, marking and colouring upon said plat certain lands to be reserved from sale; but neither the fractional section 10, or any of the divisions thereof, were so marked or coloured to be reserved from sale.

At the bottom of the President's proclamation is a general notice requiring all persons who claim the right of pre-emption to any of the lands in the proclamation mentioned, to appear before the Register and Receiver of the land office before the day appointed by said proclamation for the sale of said lands, and prove their pre-emption; and after the notice the said John Baptiste Beaubean did, on the 28th day of May, 1835, appear before the register and receiver of the land office at Chicago, there prove to the satisfaction of the said Register and Receiver that he was entitled to the right of pre-emption to the said south-west fractional quarter of fractional section ten, and Mr. Beaubean did, on the 28th day of May, 1835, enter and purchase at private sale of the United States and of the Register of said land office, the south-west fractional section ten, and then and there paid to the Receiver of said land office one dollar and twenty-five cents per acre, in full payment for said land, and obtained from the Receiver aforesaid the following receipt, to wit:

"*Land Office, at Chicago, Illinois*; 28*th May*, 1835.
" Pre-emption Act, 19th June, 1834.

No. 6. Received of John Baptiste Beaubean, of Cook county, Illinois, the sum of ninety-four dollars and sixty-one cents, being in

full payment for the south-west fractional quarter of section No. 10, in township No. 39; north of range No. 14, east of the third principal meridian, containing seventy-five acres and sixty-nine hundredths of an acre, at the rate of $1 25 per acre.    E. D. TAYLOR, *Receiver*. $94 61.—Michigan paper."

Mr. Beaubean also obtained from the register of the last mentioned land office a certificate in the words and figures following, to wit :—

*" Land Office at Chicago, Illinois, May 28th*, 1835.

" No. 6.   It is hereby certified that, in pursuance of law, John Baptiste Beaubean, of Cook county, state of Illinois, on this day purchased of the register of this office the lot or south-west fractional quarter of section number ten, in township number 39, north of range fourteen east, containing seventy-five and sixty-nine hundredths acres, at the rate of one dollar and twenty-five cents per acre, amounting to ninety-four dollars and seventy-five cents, for which the said John Baptiste Beaubean has made payment in full as required by law.   Now, therefore, be it known, that on the presentation of this certificate to the Commissioner of the General Land Office, the said John Baptiste Beaubean shall be entitled to receive a patent for the lot above described.    JAMES WHITLOCK, *Register*. Pre-emption act, 1834."

Which certificate was presented to the Commissioner of the General Land Office, and filed in the office.

Afterwards, to wit, on the 4th day of March, 1836, the Register of the said land office at Chicago made, signed, and delivered to Mr. Beaubean his certificate in the words and figures following, to wit :—

*" Land Office, Chicago, Illinois.*

" I, James Whitlock, register of the land office at Chicago, in the state of Illinois, do hereby certify that John Baptiste Beaubean, of the town of Chicago and state of Illinois, did, on the 28th day of May, in the year of our Lord 1835, under and by virtue of an act of Congress, passed on the 19th day of June, 1834, entitled, "An act to revive an act granting pre-emption rights to settlers on the public lands, passed the 29th day of May, 1830, prove to the satisfaction of the register and receiver that the said Beaubean was entitled to the right of pre-emption under said act of the 19th of June, 1834; to the south-west fractional quarter of fractional section number ten, in township 39, north of range number fourteen east, and the said Beaubean did then enter and purchase of the United States and of the register of said office the said south-west fractional quarter of fractional section number ten, in township number thirty-nine, north of range number fourteen east, of the third principal meridian, situated in the district of lands offered for sale at the land office at Chicago aforesaid, and is included in the north-east

land district of the state of Illinois, which tract of land contains seventy-five acres and sixty-nine hundredths of an acre; for which tract of land he, the said Beaubean, paid the sum of ninety-four dollars and sixty-one cents, being one dollar and twenty-five cents per acre in full payment for the same.

All of which appears by the papers on file in said land office, and by the maps, plats, and records of said office now here.

Given under my hand, as register as aforesaid, at the land office aforesaid, this 4th day of March, in the year of our Lord 1836.

                          JAMES WHITLOCK, *Register.*"

Afterwards, to wit, on the 2d day of July, 1836, Congress passed an act entitled an act to confirm the sales of public lands in certain cases; by the second section of which it is provided that "in all cases where any entry has been made under the pre-emption laws, pursuant to instructions sent to the register and receiver from the treasury department, and the proceedings have been in all other respects fair and regular, such entries and sales are hereby confirmed, and patents shall be issued thereon as in other cases."

It is admitted that the defendant, Wilcox, at the commencement of this suit, and at the time of the service of the declaration in ejectment herein, was in the occupancy and possession of the premises in said declaration mentioned, which is a stockade of pickets, including some wooden buildings in which the soldiers and officers reside, and that the rents and profits of said premises then was, and still are of the value of three dollars per month.

It is also admitted that said defendant Wilcox then was, and still is an officer in the United States army, and was ordered into possession and command of the military post on the premises, together with the United States troops under his command, by order of the Secretary of War of the United States; and that said Wilcox claims no right of ownership in himself to the land, but is in possession of and occupies the same not in his own right, but as an officer of the army of the United States only, in the command of the post, acting under order of the Secretary of War, and of his superior officer, and of the United States.

After the purchase of the said land by Mr. Beaubien, as herein before stated, to wit, on the sixth day of February, 1836, he, the said Beaubien, by deed duly executed, acknowledged, and recorded, according to the laws of the said state of Illinois, for and in consideration of the sum of ———— dollars therein expressed, sold and conveyed the said premises, in the declaration mentioned, to Murray M'Connel, the lessor of the plaintiff; who purchased with a knowledge that a controversy existed between Mr. Beaubean and the government about said land.

It is further admitted that after the purchase of the land by J. B. Beaubean, as herein before stated, Elijah Hayward, Esq., then Commissioner of the General Land Office, on the 31st of July, 1835, addressed a letter to the Register and Receiver of the land office,

at Chicago, stating that it had been represented to the department that the land officers at Chicago had permitted to be sold said south-west fractional section ten, T. 39 N. R. 14 E. including the site of Fort Dearborn, and informing them that such sale is invalid in con sequence of the reservation and appropriation of said fraction for military purposes, since the year 1824, and directing the Receiver to refund to Mr. Beaubean the amount of the purchase money paid thereon, which money was tendered by the Receiver to Mr. Beau-bean, who refused to receive the same.

On the 23d of January, in the year 1834, Elijah Hayward, then Commissioner of the General Land Office, addressed a note to the Hon. Lewis Cass, then Secretary of War of the United States, en-closing a copy of the letter of the 30th of September, 1824, from the then Secretary of War, Mr. Calhoun, requesting that said tract of land at Chicago, upon which Fort Dearborn was situated, might be reserved for the Indian department, and a copy of the Commis-sioner Graham's reply, of the 1st of October, 1824, herein before set forth, stating that he had directed the land to be reserved for mili-tary purposes, and after stating that the tract of land in question, designated as fractional section ten, T. 39 N. R. 14 E. was claimed under the act of Congress, granting pre-emption rights; and Mr. Commissioner Hayward then requested said Secretary Cass to ad-vise the office whether it was then (to wit, on the 23d of January, 1834,) needed by the war department, and if so, whether it is consi-dered a military reservation, or as a reservation for the use of the Indian department; and on the 21st of March, 1834, the Secretary of War addressed a letter in answer to the inquiry of the Commis-sioner, informing him that the reservation at Chicago, alluded to in the letter of the Commissioner, of the 23d January, 1834, was wanted, and was actually used for military purposes.

. It is admitted that various persons, from time to time, have re-sided upon the fractional quarter section ten, as well as Mr. Beau-bean, but all those persons were all, in some way, connected with the army, and acting under the command of the United States' officers; and that one Samuel T. Brady, (who was a settler at said military post,) in June, 1835, presented his claim to the right of pre-emption to the land, before the register and receiver of the said land office at Chicago, but which claim was rejected by the land officers, or never acted upon by them.

All the facts herein stated are admitted to be true; but they are not admitted to be evidence in the cause, unless the Court should be of opinion, upon the hearing of the case, that the facts, or any of them, would be admissible as evidence, if offered in evidence by one party, and objected to by the other, upon the trial of the cause before a jury.

It is agreed that, if the Court should be of opinion, upon the hear-ing of the case, that the law of the case is with the plaintiff, a judg-ment shall be rendered, that he recover his term aforesaid; and that he have his writ of possession, &c., and that a judgment be rendered

against the defendant in favour of the plaintiff, for the use of the said lessor, for the amount of the rents and profits in the said plaintiff's declaration mentioned, together with his costs. But should the Court be of opinion that the law of the case is with the defendant, then the plaintiff shall take nothing by his suit, and a judgment shall be rendered against the lessor of the plaintiff for the cost of this suit.

Each party retains the right to remove the cause to the Supreme Court of the state of Illinois, by appeal or writ of error.

The judge of the Circuit Court of Illinois gave judgment for the defendant: and an appeal was taken to the Supreme Court of Illinois, by which Court the judgment of the Circuit Court was reversed, and judgment entered for the plaintiff below.

To reverse this judgment, this writ of error was sued out at the instance of the United States; they being the parties interested in the case.

The case was argued by Mr. Butler, and by Mr. Grundy, Attorney General, for the plaintiffs; and by Mr. Key and Mr. Webster for the defendant.

For the plaintiff in error, it was contended:

I. Even if he admitted that Beaubean was entitled to right of pre-emption, and that the sale and the certificates thereof were properly made to him; still the plaintiff cannot recover in this suit.

1. On the true construction of the several acts of Congress applicable to the case; a patent is necessary to the completion of the legal title, and nothing short of it can, as against the United States, defeat their title in an action of ejectment.

2. The plaintiff can derive no aid from the law of Illinois, referred to in the opinions of the Courts below; because that law, if it attempts to make the certificate of the Register of the land office evidence of title as against the United States, is repugnant to the ordinance of 1787; to the Constitution of the United States; and to the acts of Congress for the disposal of the public lands, and is, therefore, null and void.

II. The land officers at Chicago had no jurisdiction or authority to allow, or act on the pre-emption claim of Beaubean; and the entry and pretended purchase by him were, therefore, as against the United States, utterly null and void.

1. Beaubean's possession and occupancy were subject to the control of the officers and troops of the United States stationed at Fort Dearborn; and, therefore, he could not acquire, within the meaning of the acts of Congress, a pre-emption right to any part of the premises.

2. The premises in question were withdrawn from the general operation of the pre-emption and other laws, by the act of Congress of March 3d, 1819, "to authorise the sale of certain military sites."

3. If not so withdrawn, they were yet excepted from the pre-emption laws of the 29th of May, 1830, and the 19th of June, 1834; because reserved and appropriated, or at least appropriated, for use of the United States, within the meaning of those acts.

4. The act of June 26, 1834, creating additional land districts, gives no right of pre-emption; and the plaintiff can therefore derive no title therefrom; and the premises were also excepted from that law, because reserved, within the meaning thereof, as necessary to be retained for a military post.

Mr. Justice BARBOUR delivered the opinion of the Court:

This is a writ of error to the Supreme Court of the state of Illinois, prosecuted under the 25th section of the judiciary act of 1789. It was an action of ejectment, brought by the defendant in error against the plaintiff in error.

From an agreed case stated in the record, the following appear to be the material facts upon which the questions to be decided arise. The land in question is part of fractional section 10, in township 39, north of range 14, east of the third principal meridian, in the county of Cook, and state of Illinois; and embraces the military post called Fort Dearborn, of which post, at the time of bringing the suit, Wilcox was in possession, as the commanding officer of the United States; which post was established by the United States in 1804, and was thereafter occupied by the troops of the United States until the 16th August, 1812, when the troops were massacred, and the post taken by the enemy. It was re-occupied in 1816, when the United States built upon said fractional section some factory houses for the use of the Indian department.

The troops continued to occupy it until May, 1823, when it was evacuated by order of the government, and was left in possession of the Indian agent at Chicago. In August, 1828, it was again occupied by the troops, acting under the orders of the Secretary of War, as one of the military posts of the United States. It was again evacuated by the troops in May, 1831; but the government never gave up possession of it, but left it in possession of one Oliver Newberry, who authorized a certain George Dole to take and keep it in repair; which he accordingly did. It was again occupied by the troops of the government in June, 1832, under command of an officer of the army of the United States. It has been occupied by the troops, and was generally known at Chicago to be so occupied, from that time up to the commencement of the suit; and was at the time of the trial still used for that purpose. When it was evacuated in 1831, the quartermaster at the post, acting under orders, sold the greater part of the movable property in and about the garrison belonging to the government, but sold none of the buildings. In the year 1817, John B. Beaubean bought of one John Dean, who was an army contractor at the post, a house built upon the land by Dean, at the price of $1000: there was attached to the house an enclosure occupied by Dean as a garden and field; Beaubean then took possession

2 u 2

of the house and enclosure, and continued in possession, cultivating a part of the enclosure every year, from 1817 to 1836. In 1823, the factory-houses on the land at said post were sold by order of the Secretary of the Treasury, which, after an intermediate sale, were bought by Beaubean at $500; who took possession, and continued to occupy the same, together with a part of the quarter section of land, until the commencement of this suit. Beaubean continued to occupy the houses and enclosure, and to cultivate a part of the land, without interruption, from 1817 to the commencement of this suit. The land was surveyed by government in 1821. Since it was re-occupied by the troops in 1832, and before the 1st of May, 1834, the United States built a lighthouse on part of the land, and have kept at least twenty acres constantly enclosed and cultivated for the use of the garrison. In the year 1824, at the instance of the then Indian agent at Chicago, who suggested that it would be convenient for the accommodation of the persons and protection of the property of the agency, the Secretary of War requested the Commissioner of the General Land Office to direct a reservation to be made for the use of the Indian department at that post; and in October, 1824, the Commissioner answered, saying that he had directed the section now in question to be reserved from sale, for military purposes. In May, 1831, Beaubean made a claim for pre-emption of the land in question at the land office in Palestine, which was rejected. In February, 1832, in answer to a letter from Beaubean on the subject, the Commissioner of the General Land Office informed him that the land in question was reserved for military purposes. The same information was given to others who made application in behalf of Beaubean. In 1834, he made claim for a pre-emption in the same, at the Danville land office, which was also rejected. In 1835, Beaubean applied to the land office at Chicago, when his claim to pre-emption was allowed; and he paid the purchase money, and procured the Register's certificate thereof. Wilcox went into and continued in possession, claiming no right of ownership; but as an officer of the United States only, in command of said post, acting under the orders of the Secretary of War, his superior officer, and the United States. Beaubean sold and conveyed his interest to the lessor of the plaintiff.

Upon this state of facts two questions arise which, in our opinion, embraces the whole merits of the case; and which we will now proceed to examine. The first is, whether under the facts of the case, and the law applying to them, Beaubean acquired any title whatsoever to the land in question? The second is, whether if he did acquire any title at all, is it such an one as will enable the lesser of the plaintiff to recover in this action?

As to the first question. The ground of the claim is the right of Beaubean as a settler, to a pre-emption under the act of the 19th June, 1834, entitled, "An act to revive an act granting pre-emption rights to settlers on the public lands, passed 29th of May, 1830." Now, as this act gives to the persons claiming under it the benefits

and privileges provided by the act of 1830, which it revives, we must look to this last act in order to ascertain what are those benefits and privileges, or, in other words, what is the character of the pre-emption right thus claimed; and on what lands the claim is allowed to operate. It authorizes every settler or occupant of the public lands, under the circumstances therein stated, to enter with the Register of the land office in which the land lies, by legal subdivisions, a quantity of land not exceeding a quarter section subject to the following limitations and restrictions:—"That no entry or sale of any land shall be made under the provisions of the act, which shall have been reserved for the use of the United States, or either of the several states, or which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatsoever."

Before we proceed to inquire whether the land in question falls within the scope of any one of these prohibitions, it is necessary to examine a preliminary objection which was urged at the bar, which, if sustainable would render that inquiry wholly unavailing. It is this—that the acts of Congress have given to the Registers and Receivers of the land offices the power of deciding upon claims to the right of pre-emption—that upon these questions they act judicially—that no appeal having been given from their decision, it follows as a consequence that it is conclusive and irreversible. This proposition is true in relation to every tribunal acting judicially, whilst acting within the sphere of their jurisdiction, where no appellate tribunal is created; and even when there is such an appellate power, the judgment is conclusive when it only comes collaterally into question; so long as it is unreversed. But directly the reverse of this is true in relation to the judgment of any Court acting beyond the pale of its authority. The principle upon this subject is concisely and accurately stated by this Court in the case of Elliott et al. vs. Peirsol et al., 1 Peters, 340, in these words: "where a Court has jurisdiction, it has a right to decide every question which occurs in the cause; and whether its decision be correct or otherwise, its judgment, until reversed is regarded as binding in every other Court. But if it act without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void." Now to apply this. Even assuming that the decision of the Register and Receiver, in the absence of frauds, would be conclusive as to the facts of the applicant then being in possession, and his cultivation during the preceding year, because these questions are directly submitted to them; yet if they undertake to grant pre-emptions in land in which the law declares they shall not be granted, then they are acting upon a subject matter clearly not within their jurisdiction; as much so as if a Court, whose jurisdiction was declared not to extend beyond a given sum, should attempt to take cognizance of a case beyond that sum.

We now return to the inquiry whether the land in question falls within any of the prohibitions contained in the act of Congress. Amongst others, lands, which may have been appropriated for any purpose

whatsoever, are exempt from liability to the right of pre-emption. Now, that the land in question has been appropriated in point of fact there can be no doubt, for the case agreed states that it has been used from the year 1804 until and after the institution of this suit, as well for the purpose of a military post as for that of an Indian agency, with some occasional interruption. Now this is appropriation, for that is nothing more nor less than setting apart the thing for some particular use. But it is said that this appropriation must be made by authority of law. We think that the appropriation in this case, was made by authority of law. As far back as the year 1798, see act of May 3d of that year, vol. iii. Laws U. S. 46, an appropriation was made for the purpose, amongst other things, of enabling the President of the United States to erect fortifications in such place or places as the public safety should, in his opinion, require. By the act of 21st of April, 1806, vol. iv. Laws U. S., 64, the President was authorized to establish trading houses at such posts and places, on the frontiers or in the Indian country on either or both sides of the Mississippi river, as he should judge most convenient for carrying on trade with the Indians. And, by act of June 14, 1809, he was authorized to erect such fortifications as might, in his opinion, be necessary for the protection of the northern and western frontiers. We thus see that the establishing trading houses with the Indian tribes, and the erection of fortifications in the west, are purposes authorized by law; and that they were to be established and erected by the President. But the place in question is one at which a trading house has been established, and a fortification or military post erected. It would not be doubted, we suppose, by any one, that if Congress had by law directed the trading house to be established and the military post erected at Fort Dearborn, by name; that this would have been by authority of law. But instead of designating the place themselves, they left it to the discretion of the President, which is precisely the same thing in effect. Here then is an appropriation, not only for one but for two purposes, of the same place, by authority of law. But there has been a third appropriation in this case by authority of law. Congress, by law, authorized the erection of a lighthouse at the mouth of Chicago river, which is within the limits of the land in question, and appropriated $5000 for its erection; and the case agreed states that the lighthouse was built on part of the land in dispute before the 1st of May, 1834. We think, then, that there has been an appropriation, not only in fact but in law.

There would be difficulty in deciding to what extent this appropriation reached, if there were not materials furnished by the record which reduce it to precision. At the request of the Secretary of War, the Commissioner of the General Land Office in 1824, coloured and marked upon the map this very section, as reserved for military purposes, and directed it to be reserved from sale for those purposes. We consider this, too, as having been done by authority of law; for amongst other provisions in the

[Wilcox *vs.* Jackson.]

act of 1830, all lands are exempted from pre-emption which are reserved from sale by order of the President. Now although the immediate agent in requiring this reservation was the Secretary of War, yet we feel justified in presuming that it was done by the approbation and direction of the President. The President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties. Both military posts and Indian affairs, including agencies, belong to the war department. Hence we consider the act of the war department in requiring this reservation to be made, as being in legal contemplation the act of the President; and, consequently, that the reservation thus made was in legal effect, a reservation made by order of the President, within the terms of the act of Congress.

It is argued, however, that by the 4th section of the act of the 26th of June, 1834, the President was authorized to cause to be sold all the lands in the north-east district of the state of Illinois, embracing the land in question with certain reservations only, within which it is contended that the land in question is not included—that a proclamation was issued directing various lands in said district to be sold, and that amongst the lands so proclaimed was the land in question, unless excepted by the following exception :—" the lands reserved by law for the use of schools, and for other purposes, will be excluded from the sale."—And that an extended plat was forwarded from the general land office, marking and colouring certain lands to be reserved from sale; but that the land in question was not so marked or coloured, to be reserved from sale.

In the first place we remark, that we do not consider this law as applying at all to the case. That has relation to a sale of lands in the manner prescribed by general law at public auction, whilst the claim to the land in question is founded on a right of pre-emption, and governed by different laws. The very act of 19th of June, 1834, under which this claim is made, was passed but one week before the one of which we are now speaking; thus showing that the provisions of the one were not intended to have any effect upon the subject matter on which the other operated. But we go further, and say, that whensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands; and that no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it; although no reservation were made of it.

The very act which we are now considering will furnish an illustration of this proposition. Thus, in that act there is expressly reserved from sale the land, within that district which had been granted to individuals, and the state of Illinois. Now suppose this reservation had not been made, either in the law, proclamation, or sale, could it be conceived that if that land were sold at auction, the title of the purchaser would avail against the individuals or state to whom the previous grants had been made? If, as we suppose, this

question must be answered in the negative, the same principle will apply to any land which by authority of law shall have been severed from the general mass. Let us for a moment consider to what results a contrary doctrine would lead; and the case before us will furnish a very striking illustration of them. If the party claiming the pre-emption right here were to succeed, together with the land, he would recover all the improvements made upon it at the public expense. The lighthouse and improvements alone, it seems by reference to the act making an appropriation for its erection, cost $5000. How much was expended in the buildings at the military post we have no means of knowing, but probably a considerably larger sum. Thus, besides the land purchased, for the sum of $94 61, he would recover property, and that too property necessary for the military defence and commerce of the country, which cost the United States many thousands of dollars; and if there had been expended upon it as many hundreds of thousands, as there have been thousands, the same result would follow. A principle leading to such startling consequences cannot in our opinion be a sound one. The right of pre-emption was a bounty extended to settlers and occupants of the public domain. We cannot suppose that this bounty was designed to be extended at the sacrifice of public establishments, or great public interests. When the act of 1830 was passed, Congress must have known of the authority which had by former laws been given to the President, to establish trading houses and military posts. They must have known, for it was part of the public history of the country, that a military post had been long established at Fort Dearborn; and was at the date of the law occupied as such by the troops of the United States. They seem therefore to have been studious to use language of so comprehensive a kind, in the exemption from the right of pre-emption, as to embrace every description of reservation and appropriation which had been previously made for public purposes. We have already said that we think the language in which these exemptions are expressed is comprehensive enough to embrace the present case, so as to place it beyond the reach of the right of pre-emption.

It is further argued that this case is embraced by the second section of the act of July 2d, 1836, entitled, "An act to confirm the sales of public lands in certain cases." That section is in these words: "And be it further enacted, that in all cases where an entry has been made under the pre-emption laws pursuant to instructions sent to the Register and Receiver from the treasury department, and the proceedings have been in all other respects fair and regular, such entries and sales are hereby confirmed; and patents shall be issued thereon, as in other cases." Now the first remark we make upon this act is, that when the previous law had totally exempted certain lands from the right of pre-emption, if there were nothing else in the case, it would be a very strong, not to say strained construction of this section, to hold that Congress meant thereby by implication to repeal the former law in so important a provision. But we are

satisfied that there were other cases to which it was intended to apply; where the instructions from the treasury department assumed, to say the least, a doubtful if not an illegal power. As, for example, the instructions of the 7th February and 17th October, 1831, by which entries were allowed to be made and certificates issued under the act 1830; which was only in force for one year from its passage; after the expiration of the year, where the persons claiming had been deprived of the benefits of the act of 1830, by reason of the township plats not having been furnished by the surveyor-general, and where, nevertheless, proofs of the claim had been filed before the expiration of the year. To this case, and others similarly situated, the law may well apply; because without affecting the general principles of the system, they present instances in which innocent parties would have been injured by the acts or omissions of public officers, or by some other cause, as to which no fault was imputable to them. But, further, the entries to be saved by this section must have been pursuant to instructions sent to the Register and Receiver from the treasury department. Now it not only is not shown that any instructions were so sent which would authorize this pre-emption; but, on the contrary, the agreed case shows that the Register and Receiver at the Palestine land office rejected it in 1831; that the Commissioner of the General Land Office, in the same year, in answer to a letter of Beaubean complaining of that rejection, informed him that the land was reserved for military purposes; and that in July, 1834, after the passage of the pre-emption law of that year, he applied to the Register and Receiver of the Danville land office to prove a pre-emption to the same land, who also rejected the application; and again informed him that it was reserved for military purposes. Finally, by the express terms of this section, entries under the pre-emption laws, to be protected by it must be in all other respects fair and regular. Now as the patents were to be issued by the Commissioner of the General Land Office, and as they were only to issue where the proceedings were fair and regular, that officer must of necessity be the judge of that fairness and regularity. But as he refused to issue the patent, we know not whether he considered the proceedings in this case as being fair and regular. If they were not so, then they were not confirmed. We think therefore that the claimant can derive no aid from the act of 1836. Our conclusion then, in relation to the first question is, that under the facts of the case, and the law applying to them, Beaubean acquired no title whatsoever to the land in question.

This being the case, it would not be absolutely necessary to decide the second question; but as it arises in the case, and has been fully argued, we will bestow upon it a very brief examination. That question is, whether if he had acquired any title at all, it was such an one as would enable the lessor of the plaintiff below to recover in this action? Wilcox, the defendant in the original suit, did not claim, or pretend to set up any right or title in himself. He held possession as an officer of the United States; and for them, and under

their orders. This being the state of the case, the question which we are now examining is really this, whether a person holding a register's certificate without a patent, can recover the land as against the United States.

We think it unnecessary to go into a detailed examination of the various acts of Congress, for the purpose of showing what we consider to be true in regard to the public lands, that with the exception of a few cases, nothing but a patent passes a perfect and consummate title. One class of cases to be excepted is where an act of Congress grants land, as is sometimes done in words of present grant. But we need not go into these exceptions. The general rule is what we have stated; and it applies as well to pre-emptions as to other purchases of public lands. Thus it will appear by the very act of 1836 which we have been examining, that patents are to issue in pre-emption cases. This then being the case, and this suit having been in effect against the United States; to hold that the party could recover as against them, would be to hold that a party having an inchoate and imperfect title could recover against the one in whom resided the perfect title. This, as a general proposition of law, unquestionably, cannot be maintained.

But it is argued that a law of the state of Illinois declares that a Register's certificate shall be deemed evidence of title in the party sufficient to recover possession of the lands described in such certificate, in any action of ejectment or forcible entry and detainer; but the same law declares that this shall be the case, unless a better legal and paramount title be exhibited for the same. Upon the construction of the law itself it would not apply to this case, because the United States not having parted with a consummate legal title by issuing a patent, a better legal and paramount title was exhibited for the same. Where that was not the case; but the suit should be against any person not having the right of possession, or against a trespasser, these are the kinds of cases in which it would seem to us, by the proper construction of the act, that it was intended to operate.

A much stronger ground however has been taken in argument. It has been said that the state of Illinois has a right to declare by law that a title derived from the United States, which by their laws is only inchoate and imperfect, shall be deemed as perfect a title as if a patent had issued from the United States; and the construction of her own Courts seems to give that effect to her statute. That state has an undoubted right to legislate as she may please in regard to the remedies to be prosecuted in her Courts, and to regulate the disposition of the property of her citizens by descent, devise, or alienation. But the property in question was a part of the public domain of the United States: Congress is invested by the Constitution with the power of disposing of, and making needful rules and regulations respecting it. Congress has declared, as we have said, by its legislation, that in such a case as this a patent is necessary to complete the title. But in this case no patent has issued; and therefore by the laws of the United States the legal title has not passed,

but remains in the United States.   Now if it were competent for a
state legislature to say; that notwithstanding this, the title shall be
deemed to have passed; the effect of this would be, not that Con-
gress had the power of disposing of the public lands, and prescribing
the rules and regulations concerning that disposition, but that Illinois
possessed it.  That would be to make the laws of Illinois paramount
to those of Congress, in relation to a subject confided by the Consti-
tution to Congress only.   And the practical result in this very case
would be, by force of state legislation to take from the United
States their own land, against their own will, and against their own
laws.   We hold the true principle to be this, that whenever the
question in any Court, state or federal, is, whether a title to land
which had once been the property of the United States has passed,
that question must be resolved by the laws of the United States;
but that whenever, according to those laws, the title shall have
passed, then that property, like all other property in the state, is
subject to state legislation; so far as that legislation is consistent
with the admission that the title passed and vested according to the
laws of the United States.

   It was urged at the bar, that the case of Ross vs. Doe on the de-
mise of Barland and others, in this Court, 1 Peters, 656, sustained
the ground taken as to the obligatory force of the law of Illinois.
A very brief examination of that case will show that it falls greatly
short of what it is supposed to decide.  That was a conflict-between
two patentees, both claiming under the United States.   The elder
patent was founded upon a certificate of the Register of the land of-
fice west of Pearl river.   The junior patent was issued on a certifi-
cate of the board of Commissioners west of Pearl river.  The Court
below instructed the jury that the junior patent of the plaintiff in
ejectment, emanating upon a certificate for a donation claim prior
in date to the patent under which the defendant claimed, would
overreach the elder patent of the defendant, and in point of law,
prevail against it.   It appears, that by the mode of proceeding in
Mississippi, they look beyond the grant.   This Court, remarking
upon that, said, that in so doing, and in applying their peculiar mode
of proceeding to titles derived through and under the laws of the
United States, they violated no provisions of any statute of the
United States.

   But the Court then proceeded to say : " The important question
in the case is this; in applying its own principles and practice in the
action of ejectment, as might well be done in this case, has the
Court misconstrued the act of Congress in deciding that the grant
of the plaintiff, emanating upon the donation certificate of the
oard of Commissioners west of Pearl river set forth in the record,
would overreach the defendant's grant, and should prevail against
it in the action of ejectment."  They then proceed to examine the
various acts of Congress upon the subject; declare their opinion to
be, that the determination of the Commissioners was final; and
come to the conclusion, that the Supreme Court of Mississippi had

not misconstrued the acts of Congress, from which the rights of the parties were derived; and, consequently, affirmed the judgment. Thus it will appear, that in that case, whilst the form and mode of proceeding by the law of Mississippi were recognised, yet the rights of the parties depended exclusively upon the construction of acts of Congress; and that this Court thought that the Court below had construed them correctly. This case, then, affords no countenance whatever to the argument founded upon it.

Upon the whole, we are of opinion that the judgment of the Supreme Court of Illinois is erroneous: it is. therefore, reversed, with costs.

This cause came on to be heard on the transcript of the record from the Supreme Court of the state of Illinois, and was argued by counsel. On consideration whereof, it is ordered and adjudged by this Court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, reversed and annulled, with costs; and that this cause be, and the same is hereby, remanded to the said Supreme Court, that such further proceedings may be had therein, in conformity to the opinion and judgment of this Court, and as to law and justice may appertain.