## BOURDIEU v. PACIFIC WESTERN OIL CO. et al.*

### No. 7808.

Circuit Court of Appeals, Ninth Circuit.

Dec. 20, 1935.

Chandler, Wright & Ward, H. W. Wright, and A. B. Dorman, all of Los Angeles, Cal., for appellant.

Herbert W. Clark, Felix T. Smith, Morrison, Hohfeld, Foerster, Shuman & Clark, and Pillsbury, Madison & Sutro, all of San Francisco, Cal., for appellees Pacific Western Oil Co. et al.

George W. Nilsson, of Los Angeles, Cal., for appellee Kettleman North Dome Ass'n.

Herman Phleger and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for appellee Frank Kennedy.

W. J. Kenney and Orrick, Palmer & Dahlquist, all of San Francisco, Cal., for appellee Franklin Kenney.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

On October 24, 1935, appellees filed herein a motion suggesting diminution of the record for the purpose of presenting to this court the motions to dismiss made below by appellees Pacific Western Oil Company, a

*Rehearing denied Jan. 27, 1936.

corporation, Kettleman Oil Company, a corporation, Frank Kennedy, and Kettleman North Dome Association, a corporation, the said motions to dismiss are necessary to a fair consideration of this case, and the motion for diminution of the record is hereby allowed.

Complainant has appealed from an adverse decree in a suit wherein he asked that one of the defendants be adjudged to be holding an oil lease in trust for complainant, and for an accounting of the proceeds derived from the lease, premises covered by the lease, or the permit upon which the lease was based. The lease in controversy covered 322.89 acres of land in Fresno county, Cal.

The evidence shows that a government surveyor's field notes, prepared August 19, 1882, with respect to certain land, including the land involved herein, recited in part: "Township 21 S. Range 17 E. is very broken and mountainous and is used by the settlers for sheep husbandry and affords ample pasturage for thousands of sheep in the spring time, but, owing to its scarcity of water, is not used much in summer. Greasewood, sage and bunch grass abounds. Minerals have not been found."

At the time of the trial, it was stipulated by counsel that the deputy surveyor making the report contained in the field notes set out above said the lands were agricultural lands in 1882 and that no minerals had been discovered.

The evidence also shows that Ralph Arnold in 1907, then employed by the United States Geological Survey, was engaged in mapping all lands which appeared to have oil possibilities in and around the vicinity of the land involved in this suit. After a conference had with the Secretary of the Interior in 1907, Arnold recommended that a large amount of land, including the land in question, be withdrawn from homestead entry, pending investigation. The Acting Secretary of the Interior directed the Commissioner of the General Land Office to withdraw certain lands described, including the land in question here. Accordingly, an order was made on August 21, 1907, directed to the registers and receivers of appropriate land offices withdrawing such lands, including those in question here, as follows: "By direction of the Acting Secretary of the Interior, dated August 15, 1907, the lands embraced in the attached list, situated in Fresno and Kings

Counties, are temporarily withdrawn from agricultural entry pending an investigation of the character thereof by the Geological Survey. You will note the withdrawals on your records and thereafter accept no agricultural entries or filings thereof until further advised by this office."

Thereafter, on June 17, 1908, the Director of the United States Geological Survey wrote to the Commissioner of the General Land Office stating that he was inclosing a list of lands "which have been classified as mineral lands by the geologists of this Bureau." In this letter it is stated: "It is therefore requested that the lands mentioned in the accompanying list be withdrawn from any but mineral land entry. It is believed that all of the other lands * * * are non-mineral bearing in so far as petroleum is concerned."

The land involved in this suit was not thus classified as mineral land.

On July 10, 1908, the Acting Commissioner of the General Land Office wrote to the Register and Receiver, in whose jurisdiction the lands described in the preceding letter were located, in part as follows:

"I am * * * in receipt of a report dated June 17, 1908, from the Director of the Geological Survey, in which the lands described in the list hereto attached are classified as oil lands. You will note this classification on your records * * *

"The remainder of the lands withdrawn by said letters * * * and not hereby classified * * * are restored to filing and entry under the general land laws. * * * *"

The various factors surrounding and leading up to the withdrawal order of September 27, 1909, were related by defendants' witness, Edward C. Finney, who had been continuously connected with the Interior Department from September 1, 1894, to April 17, 1933, with the exception of six months in 1911, as follows:

"Prior to September 27, 1909, it had been the practice of the Department to classify lands for the purpose of disposition. In other words, it was the duty of the Secretary of the Interior to dispose of coal lands only under what were known as the coal land laws; and the same with placer oil and mineral, which were disposable only under the placer mining laws. If it was desert land, non-mineral in character, it was subject to entry under the desert land laws. So that it had been the practice of the De-

partment to make withdrawals from time to time for purposes of classification, in aid of proper disposition. For illustration, the statute with respect to coal lands, fixed a minimum price and withdrawal for coal classification was also for the purpose not only of determining whether it was coal or non-coal land, but if determined to be coal, to determine its content, and to fix what was deemed a proper price on the disposition of that mineral.

"The old mining laws as to Placer oil or placer gold, fixed a flat price of $2.50 per acre, so that any withdrawal of lands of that type could only be for the purpose of classifying them as mineral or nonmineral. Along in 1909, and possibly in 1908, there was a change in policy discussed, and in 1909 actually adopted by the President and by the Secretary of the Interior. It was felt that the coal laws were inadequate and inappropriate and too limited to fit coal. It was felt that the Placer mining laws were inadequate for the disposition of oil and gas, and possibly potash, nitrates and asphaltic minerals, for several reasons; the acreage which might be taken was too limited for a large and expensive operation, and the government had no control whatever after patent issued, and in order to prevent waste or regulate the drilling of wells, a sentiment grew up, and was advocated by prominent men in the government, for a change in the law from a sales act to a leasing act. * * * *"

The withdrawal order of September 27, 1909, signed by President Taft temporarily withdrew more than three million acres of land, including that in controversy here, "from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or non-mineral public land laws." This order was by order of President Taft, ratified, confirmed, and continued by an order of July 2, 1910.

The Pickett Act (Act of June 25, 1910, 36 Stat. 847, § 1 [43 U.S.C.A. § 141]) provided: "The President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress."

The Land Classification Board, Oil Section, of the United States Geological Survey, on December 27, 1910, considered evidence relating to the character of certain lands, including the land in question herein. Whether or not the Board classified the lands in question is in dispute. Appellant introduced a letter dated July 17, 1931, from the Acting Director of the Geological Survey, in regard to the land here in question saying that "subsequent to order of withdrawal on December 30, 1910, Petroleum Reserve 16, California, No. 7, the Geological Survey has not made a formal mineral classification of this section." On the other hand, appellees introduced evidence that the file containing the minutes of this meeting had been lost, and then introduced over appellant's objection evidence of Max W. Ball, who was then a member of the Oil Section, and who participated in the meeting, to the effect that the land in question was classified by said Oil Section at that time as oil and gas land.

On the following day, the Acting Director of the Geological Survey wrote the Secretary of the Interior that information received from the field indicated that certion lands, including the land in question, were valuable, for oil, and recommended the submission of an order of withdrawal to the President for appropriate action. The next day such order was submitted to the President by the Acting Secretary of the Interior with the latter's favorable recommendation.

On December 30, 1910, President Taft affixed his signature to the order of withdrawal, which described 18,480 acres, and included the land in question, which order is described as "Petroleum Reserve No. 16—California No. 7," and is in part as follows:

"It is hereby ordered that the following described lands be and the same are hereby withdrawn from settlement, location, sale or entry, and reserved for classification and in aid of legislation affecting the use and disposal of petroleum lands belonging to the United States. * ` * * "

"The area involved in this order is 18,480 acres, which will make a total area of petroleum withdrawals outstanding in California of 2,626,986 acres."

The enabling or separation act of July 17, 1914, § 1 (30 U.S.C.A. § 121) provided in part: "Lands withdrawn or classified as * ` * * oil, gas, or asphaltic minerals, or which are valuable for those deposits, shall

be subject to * * * entry * * * under the nonmineral land laws of the United States, whenever such * * * entry * * * shall be made with a view of obtaining or passing title with a reservation to the United States of the deposits on account of which the lands were withdrawn or classified or reported as valuable."

This act (section 2, 30 U.S.C.A. § 122) also provided for the issuance of a patent containing the reservation of mineral rights; provided for entry on the land by one who had acquired from the United States the title or right to mine and remove the reserved deposits, and further provided: "Nothing herein contained shall be held to deny or abridge the right to present and have prompt consideration of applications to * * * enter * * * under the land laws of the United States, lands which have been withdrawn or classified as * * * oil, gas, or asphaltic mineral lands, with a view of disproving such classification and securing patent without reservation."

On March 6, 1919, appellant filed his homestead entry pursuant to the Act of February 19, 1909, as amended (43 U.S.C.A. § 218), which provided that the application was made in accordance with, and subject to, the provisions and reservations of the Act of July 17, 1914, from which we have just quoted.

The Leasing Act of February 25, 1920 (30 U.S.C.A. § 221 et seq.), provided for the issuance of a prospecting permit by the Secretary of the Interior "under such necessary and proper rules and regulations as he may prescribe" and for the issuance of a lease covering the lands described in the permit upon certain conditions. Section 20 of this act (30 U.S.C.A. § 229) provides: "In the case of lands bona fide entered as agricultural, and not withdrawn or classified as mineral at the time of entry * * * the entryman * * * if the entry has been patented with the mineral right reserved, shall be entitled to a preference right to a permit and to a lease, as herein provided, in case of discovery."

By section 32 of this act (30 U.S.C.A. § 189) the Secretary of the Interior was authorized to prescribe necessary and proper rules and regulations to carry out the provisions of the above quoted section.

On March 11, 1920, certain rules were promulgated by the Secretary of the Interior (47 L.D. 437), and it was provided in rule 12

(a) (47 L.D. 437, 444): "Should an application for permit for entered or patented lands with a reservation of the oil and gas content to the United States be filed by a person other than the entryman or owner of the land, the applicant will be required to serve personal notice of such application upon the owner or owners of the land so entered or patented, with a warning therein that if said owner desires to exercise his preference right, if any, to a permit, he must file within 30 days his application therefor in the proper local land office. The applicant must furnish evidence of the service of notice on the owner and evidence that the party served is the owner of the land involved, either by his affidavit, duly corroborated, or by certificate of the officer in whose office transfers of real property are to be recorded."

Some time prior to May 28, 1921, defendant Crum made application for an oil and gas prospecting permit covering certain lands, including those owned by appellant. This defendant was called as a witness on behalf of complainant and testified as follows: "At the time that I made application for this permit, I did not serve notice in writing upon Jean Bourdieu informing him that I intended to make application for permit to prospect on the lands involved in this action. I did not give Mr. Bourdieu any notice at any time nor did I file any evidence of notice with the Department."

On May 29, 1921, the Secretary of the Interior issued the permit applied for which covered appellant's lands.

Complainant testified that a well was being drilled on land adjacent to his in the fall of 1924, and that he could see the drilling rig from his house.

On June 8, 1925, there was issued to complainant a register's final certificate (homestead) which provided: "Patent to contain provisions, reservations, conditions and limitations of the Act of July 17, 1914 (38 Stat. 509 [30 U.S.C.A. § 121 et seq.]) as to oil and gas."

On October 7, 1925, a patent to the lands involved herein was issued to complainant; the reservation clause in such patent providing: " * * * Excepting and reserving to the United States all the oil and gas in the lands so patented, and to it, or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914. * * *"

Complainant testified that not less than three years prior to 1928 he learned that he had a preference right for an oil and gas prospecting permit; that in July, 1928, he was told that the Crum permit covered his land; that in the winter of 1928 another well was being drilled in the immediate vicinity of his land.

In the mean time the Crum permit, by various conveyances, was acquired by appellees Kettleman Oil Corporation, Limited, and Pacific Western Oil Company, each of which owned an undivided one-half interest in said permit. On October 4, 1929, there was issued to these two corporations a lease of oil and gas lands, which covered appellant's land. Complainant testified that he first learned that such a lease had been issued covering his lands when he read it in the Coalinga paper in January, 1930.

On July 1, 1931, complainant filed his bill alleging his ownership in the land since filing his entry, his preference right, and that his entry was bona fide on the land as agricultural. He further alleged that the Crum permit was issued without notice to him, that the permit was conveyed by Crum to others, that he first learned of the issuance of the permit in July, 1928, and tendered to the parties holding the lease the amount expended for assessments on the land, for drilling and exploring.

The relief asked in the bill of complaint in this case is that the decree declare that the lease is held by the owners thereof in trust for complainant, that such owners be required to convey said lease to complainant, and for an accounting.

The trial court held that, since the withdrawal order of December 30, 1910, had not been revoked, the lands were both withdrawn from entry as being petroleum lands and classified as such, and therefore the provision for preference in the leasing act had no application, and complainant had no right of preference. It was also held that complainant's laches was a bar to the suit.

Appellant's contentions may be summarized as follows: First, that the lands were classified as agricultural by the surveyor in 1882, and again by the Geological Survey in 1908, that this agricultural character persists until its mineral character is determined, that the mineral character is not determined until it is known to contain valuable mineral deposits, and that the with-

drawal order of December 30, 1910, did not amount to a contest or protest challenging the agricultural character of the land; second, that appellant made a bona fide entry on the lands as an agricultural entry, and that the Leasing Act gives him a preference right for lands "reported as valuable," for the act gives a preference right except where the lands are withdrawn as mineral or classified as mineral; third, that the Land Classification Board, Oil Section, United States Geological Survey, did not classify the land as mineral on December 27, 1910, as shown by the Director's letter of December 28, 1910; that the withdrawal order of December 30, 1910, did not classify the lands because the order states that they were merely reserved for classification, that the practice in the land office after such orders of withdrawal were made was to subsequently classify the lands withdrawn, that the decisions of the land office hold that a temporary withdrawal order does not classify the lands, and that, in order to constitute a mineral classification, there must be a known value, the controlling feature being "value" and not "kind"; fourth, that the order of withdrawal of December 30, 1910, did not withdraw the lands as mineral, because the lands could not be withdrawn as mineral until they had been classified as such, and, since there was no evidence that the lands had a known mineral value, they were not classified; fifth, that evidence of the member of the Land Classification Board that the land was classified was not admissible, because the official bulletin of the Land Department showing what lands were classified and the letter of December 28, 1910, to the Secretary from the Director were the best evidence, that evidence introduced by appellees of expenditures made by them in developing the field near the vicinity of appellant's lands was inadmissible for the purpose of proving laches; sixth, that appellant was not guilty of laches.

The United States was not made a party to this suit, and it is conceded that the United States is the owner of the oil and gas deposits. It is shown that two of the appellees are lessees of the government, and by reason thereof have a permissive right to remove the oil and gas deposits. It is apparent, therefore, that neither the court below nor this court has jurisdiction of the subject-matter of the suit, and therefore the motion to dismiss made by appellees in the court below should have been sustained.

In Bockfinger v. Foster, 190 U.S. 116, 126, 23 S.Ct. 836, 840, 47 L.Ed. 975, it was said concerning Wilcox v. Jackson, 13 Pet. 498, 10 L.Ed. 264, and United States v. Schurz, 102 U.S. 378, 402, 26 L.Ed. 167, 173: "But those cases equally recognize the principle that the courts will not interfere with the Land Department in its control and disposal of the public lands, under the legislation of Congress, so long as the title in any essential sense remains in the United States."

In Wilson v. Elk Coal Co., 7 F.(2d) 112, 113 (certiorari denied 269 U.S. 587, 46 S. Ct. 203, 70 L.Ed. 426), this court, in a contest involving a preference right in coal lands, said: "It may be that the appellant had, and still has, a remedy by mandamus against the proper officer of the United States, to compel the issuance of a patent. * * * But, be that as it may, we are clearly of opinion that the courts are without jurisdiction to grant relief in favor of one claiming only an equitable title, as against a party in possession under a lease from the United States, so long as the title remains in the United States."

That case was followed by us in Proctor v. Painter, 15 F.(2d) 974.

Although in Skeen v. Lynch (C.C.A. 10) 48 F.(2d) 1044 (certiorari denied 284 U.S. 633, 52 S.Ct. 17, 76 L.Ed. 539) in the second cause of action relating to a preference right under the Leasing Act, the jurisdictional point was not raised, it was held with respect to that clause of the bill that the preference right given by the Leasing Act applied only to entries made without reservation of the mineral rights.

Since we have held that this court has no jurisdiction, we are unable to consider this and the related questions urged by appellants.

This suit and complainant's complaint must be dismissed, and it is so ordered.