# Jacob Marshall and William B. Whitesides, *vs.* John D. Bush.

### *Appeal from Dubuque.*

Where A has a pre-emptive right to a lot of land belonging to the United States, sells the same to B, and takes a mortgage to secure the payment of the consideration money, if B afterwards purchases the same lands from the United States at public auction, and thus prevents A from obtaining the fee simple title, with power to fulfil his engagement, he, B, cannot set up his title from the United States in bar to the foreclosure of the mortgage.

The title which the mortgagee obtains, enures to the benefit of the mortgager.

William B. Whitesides, in 1839, claimed to own the legal interest in two lots in the town of Dubuque, numbered seven and one hundred and ninety-four, (which was laid off by the United States) for the benefit of Jacob Marshall. Whitesides claimed to have the pre-emptive right to said lots and held the certificates of the commissioners for laying off the towns of Dubuque &c., and that he was entitled to the pre-emption to said lots.

Marshall & Whitesides agreed to sell said lots to Bush for $3,000, and Whitesides conveyed to him by deed of general warranty. Bush paid down $1500, and gave his note for the other $1500, payable the first October following, and mortgaged the lots by deed of general warranty to secure the payment of the note, which was payable to Marshall.

Bush failing to pay the note when it became due, Whitesides & Marshall filed their bill to foreclose the mortgage, and for the sale of the lots, Bush, in his answer set up in defence :

1. That at the time of the sale aforesaid, Whitesides & and Marshall had no pre-emptive right to the lots.

2. That after the purchase by him as aforesaid, in September, 1840, Whitesides relinquished his right of pre-emption to the lots, against the will of Bush, and that they were put up to public sale, and that Bush became the purchaser of one of the lots and Whitesides of the other, and that the sale and purchase as aforesaid, released Bush from all obligation to pay the residue of the purchase money.

The court below by their decree, found that there was due at the date

of the decree, July 12, 1842, for principal and interest, the sum of $1608-82, and decreed a foreclosure of the equity of redemption and a sale of the property to pay the balance due.

The testimony adduced showed that at the time of the sale, Whitesides had a certificate from the commissioners for the pre-emption of said lots. That Whitesides & Bush were in possession of the property sold by their tenant, that they assigned the lease to Bush, and he went into possession of the same and had continued in quiet possession thereof. That said lots were improved, at the time, and that Whitesides then, and prior thereto claimed the same under the original takers up, and improvers, and had continued in such possession up to the time of the sale to Bush as aforesaid, that at the time of sale, the house and lots were under rent at $70 per month.

That subsequent to the sale such proceedings were had in the land office at Dubuque, that the certificates of pre-emption aforesaid, were not allowed by the land office, and Bush was refused the right to enter the lots by pre-emption. By agreement, Bush was to enter the lots and furnish the money for so doing. That in order to perfect the title to the lots, Whitesides informed Bush that he should relinquish his right to them, to the United States, and that Bush would attend the sale and buy them in under his contract with Whitesides ; he would make no opposition to his so doing. But that he, Bush, would not do this ; that he, Whitesides, would buy in the lots himself in order to make good the title to Bush.

That Whitesides did accordingly relinquish, and made arrangements to purchase as aforesaid, of all of which Bush had due notice.

That the lots were put up at public sale and Whitesides became the purchaser of lot No. 194, and by his agent bid for No. 7, but that Bush over bid him and became the purchaser thereof. That Whitesides and Bush were the only bidders for the lot.

The decree in favor of the complainants was made at the February term 1842, Judge Wilson presiding. And is as follows, to wit:

" And now at this day comes the complainants by Davis & Crawford their solicitors, and the respondent by John V. Berry, his attorney, and the court being ready to decide this cause upon the pleading exhibits and testimony produced by the parties, and the solemn arguments thereupon had at the last term of this court, do find that the respondent executed his note and gave his mortgage upon lots No. 7 and 194, in the city of Dubuque, as designated in the government plat thereof, for the securing the payment of one thousand five hundred dollars of the principal of said

note, as the complainants in their bill of complaint have alledged. And the court doth further find that no sufficient matter has been shown and sustained by the defendant to exempt said property from the liability of said mortgage; and the court doth further find that of the said note of one thousand seven hundred and ninety dollars, fifteen hundred dollars of which was secured by said deed of mortgage mentioned in the pleadings, there remains due one thousand six hundred and eight dollars and eighty-two cents. The court doth therefore judge and decree that the respondent pay to the said Jacob Marshall, the payee of said sum of $1,608,82, with interest thereon at six per cent per annum until paid, within ten days from the date of this decree, together with the costs of the complainants about their suit in this behalf expended, to be taxed by by this court. And in default thereof, the court doth hereby order, adjudge and decree that the said lots and appurtenances be sold by the sheriff of this county, as lands are sold under execution, issuing from the common law side of said court, and that said complainants have execution for the said sum of $1,608,82 and costs of suit, in case default be made in the said payment."

From which decree the defendant appealed to this court.

Davis & Crawford, for complainants.

Berry, for defendant.

Per Curiam, Mason, Chief Justice.—The petition in this case sets forth the ordinary case for the forclosure of a mortgage. The answer admits all the material allegations in the petition, but sets up new matter in avoidance. This requires proof. Did this proof fully sustain the allegations in the answer, the defence would be complete. Such misrepresentation and fraud are charged in relation to the transaction as if true, to render the whole invalid.

The first and most material of these allegations is, that the complainants represented to the defendant that they had a perfect pre-emption right to the town lots which are the subject of the mortgage now sought to be foreclosed, at the time of the sale and mortgage as set forth in the petition in this case, *and that they well knew at the time that they had no such pre-emption right.*

The proof sustains this allegation so far as concerns the representation aforesaid, but fails to show that they knew the same to be false, so far from this it does not appear but that the statement itself was literally

true. It is abundantly proved that one of the complainants had the pre-emption certificates from the commissioners for the lots in question, and for ought that appears, those certificates were genuine and valid. Their very representations to that effect when called for as admissions are legitimate testimony on the subject, sufficient to establish the fact itself, unless disproved.

The only circumstances I recollect tending to disprove that conclusion, are that Whitesides relinquished his certificate and that Bush was unsuccessful in endeavoring to obtain a title from the land office by virtue of the certificate. These circumstances are by no means conclusive and hardly sufficient to counterbalance the evidence on the other side, and furnishes no proof whatever of a *fraudulent misrepresentation.*

Similar allegations of fraud are also made in relation to the bar fixtures as well as to the ability and punctuality of Hale in relation to making payments, but these seem wholly unsupported by proof. The charge of fraud is therefore altogether unsustained.

The illegality of the transaction is also relied upon as another ground of defence, but, as it seems to me, without any good reason. This court has often decided that traffic in the public lands even before the obtaining of a pre-emption, was contrary neither to the laws nor policy of the general government. Much less can the contract in this case be illegal, which was made in relation to land for which certificates of pre-emption had previously been issued by commissioners acting by the authority of Congress. There was no contract that the defendant should not bid at the public sale.

A third class of objections set forth in the assignment of errors, refers to a want or failure of consideration for the mortgage in question. It is said that inasmuch as the mortgage was given to secure the purchase money for the lots sold by complainants to defendant, and inasmuch as the complainants are by their own act made unable to convey one and the most valuable of those lots, they have no right to the purchase money remaining now due. We are left much in the dark with regard to the sale from complainants to defendant. It is alledged on the one side and admitted on the other, that such a transaction took place, but the deed is not exhibited and we are uninformed as to the real nature of that transaction. Was that instrument a deed of warranty or a mere quit claim. If the latter, the defendant is clearly remediless where there has been no fraud.

But suppose it to have been a deed of warranty, has there been a breach of that warranty ? If so, has not such breach resulted from the

act of the defendant himself? The defendant has certainly received no detriment from the course events have taken. He has obtained a perfect title by the payment of the purchase money to the United States, which is exactly what he had contracted for. If he has paid more than the minimum price, the necessity of so doing resulted from his own act.— But there is no stipulation that he should only pay the minimum price. Had he not interfered in the matter, the complainants would have fulfilled their engagement to him. There were no bidders at the sale but the parties to this suit. It is true the defendant had a perfect right to bid at the public sale, but if by so doing he prevented the complainants from being able to fulfil their contract with him, he has no right to complain, especially as no damage has resulted to him on that account.

The case of Hull vs. Cunningham's executors, 1 Mun. R. 330, corroborates the position here taken to the fullest extent. In that case A had purchased a tract of land of B, embraced within certain boundaries, contrary to the supposition of both parties, it was afterwards ascertained that a considerable portion of the tract was not owned by B, but was government land belonging to the State. A, upon learning this fact, entered the land himself and then filed his bill for a pro rata reduction of the amount of the purchase money. The court held that all A had a right to claim was the amount he had advanced for the entering of the land together with a reasonable compensation for his trouble; a rule which applied to this case, would leave the defendant remediless on the point we are now discussing.

As to the relinquishment by Whitesides in opposition to the wishes of Bush, that is a matter to which no valid objection can be made by the latter. At their own peril the complainants had a right to take that step. Had they failed to secure the property without any interference from Bush, he would then have had his remedy. But in order to be in a condition to take advantage of that measure, he ought not to have been himself the cause of its failure. If the complainants were irresponsible so that he would have been unsafe in relying upon his remedy over against them, he would have been perfectly right in bidding at the sale or taking any other step proper for securing his own interest, but the most he could claim against the complainants in such a case would be a compensation for the expense to which he had been subjected by their relinquishment, which in the present case is just nothing at all.

The counsel for the defendant treats this case as though it were a bill filed to enforce a specific performance. Under the old English law and practice, such a view of the matter would have been more correct. But

under the law and practice in the United States generally, and particularly in this territory, the foreclosure of a mortgage is very different from the enforcing of a specific performance.   It is a means provided by law for the collection of a debt.   The debt is the principal; the mortgage merely the security.   The mortgagee does not obtain possession of the property mortgaged, but such property is sold for the purpose of discharging the debt.   It is no more the enforcing of a specific performance than is the sale of a house on a proceeding under the mechanic's lien law.

Much is said of illegal combination and the countenance which this court may give to it, but these observations seem to me to be founded in but a slight degree, upon the evidence in the case.   But even if all the facts to which the counsel alludes had been set forth in the evidence, it is doubtful whether it would have made much change in the result.   We cannot step out of our legitimate path to punish offences, however much they may be deserving of it.   If the complainants have been guilty of an offence let them be punished according to law, but they are not thereby become outlaws, so that courts of justice are to be closed against them.   Their illegal proceedings, if there were any such, have not been so connected with, and incorporated into this transaction as to render the whole invalid.   The deed from one of the parties and the mortgage from the other were legally given, and if there was an illegal combination in relation to the bidding at the public sale, it was wholly inoperative so far as this case is concerned.   At all events it was no part of this transaction.

But it is contended that this court has no right to foreclose this mortgage, inasmuch as it would create a title in opposition to the laws of the United States.   If it would have such an effect, the proposition would be evidently correct.   But it would have no such effect unless it can be shown that where lands are purchased from the government, those lands can never afterwards be sold for debt.

Bush mortgaged lands to which he had not a good title.   Such a title was however, afterwards obtained.   This enures to the benefit of the mortgagee.   1 *Powell on Mortgages*, 190.   Counsel seem to entertain an idea that there is some magic in a title obtained from the U. States.   Such a title is however endowed with no peculiar attributes.   It is to be considered on the same footing with one obtained from an individual and treated in the same way.   It is just as liable to be sold on execution.   If land is mortgaged and afterwards such a title is obtained, it enures in equity to the benefit of the mortgagee in the same manner.   The fore-

closure of this mortgage will not be creating a title in opposition to the laws of the United States. It will be merely directing lands to be sold for the purpose of discharging a debt secured by mortgage upon those lands which by the general rules of law are made subject to such mortgage.

It is also contended that lands are not subjected to the control of our laws until a patent has issued for the same. I think there is no evidence in this case showing that a patent has not issued and the party relying upon a fact to support his case must show that fact. But suppose the patent has not issued, our law makes the receiver's receipt evidence of title. But here again the counsel for the defendant insists that such a law is of no force, and cites the case of Wilcox vs. Jackson, 13 Peters, 498. In that case the decision went no farther than to declare that where a patent has not issued for a part of the public lands, a State has no power to declare any title less than a patent valid *against a claim of the United States to the land, or against a title held under a patent granted by the United States.* I know of no authority denying to a State or territory the power of rendering the receipt of the receiver evidence of title, unless the same comes into collision with a patent or with a claim of the United States. Neither of these are set up in the present instance.

Another point made by the appellant in this case is that there should have been a deduction made for the fixtures that belonged to Hale, but I think this point is unsustained by the testimony. The deed to Bush not being made an exhibit, we are unable to say whether the fixtures were sold to him or not. The party claiming the deduction should have shown affirmatively his right thereto.

I think therefore the decree of the court below should be affirmed.