## BRACKEN VS. PARKINSON and others.

1. DECISIONS OF LAND OFFICERS — WHEN CONCLUSIVE. The decision of the register and receiver of a land office, upon a contested right of pre-emption, is conclusive, and will not be reversed or disregarded by the courts, unless in case of fraud, or clear and conclusive mistake, or where the land officers have exceeded their jurisdiction. In such cases they act in a *quasi* judicial capacity, and when acting within the sphere of their jurisdiction, every legal intendment is to be made in favor of their decisions, and no relief can be granted by the courts against their decisions, unless the party complaining makes out a clear case of fraud or mistake.

2. SAME. Where B. and P. severally claimed a right of pre-emption to a quarter section of land, and there had been repeated investigations of their claims before the register and receiver, who decided that each was entitled to a pre-emption of the one-half thereof on which his improvements had been made; and this decision was affirmed, on appeal, by the commissioner of the general land office, and afterward by the secretary of the treasury. *Held*, in the absence of proof of fraud or mistake, that such decision was conclusive upon the rights of the parties.

APPEAL from the District Court for *Dane* County.

The complainant, *Charles Bracken*, filed his bill of complaint against *Daniel M. Parkinson, Lewis D. Vanmatre, John Vanmatre, and the unknown heirs of Andrew P. Vanmatre, deceased*, and *Aaron Colley*, setting forth that in August, 1828, he surveyed for Lawrence, Bailey, Moore and Reed a tract of 320 acres, which they

had leased of the agent of the lead mines for smelting purposes; that in July, 1829, an addition to said survey was made for said Bailey by Samuel Cole, adjoining the former survey, and the two surveys included nearly all of what afterward proved to be the west half of section 27, in township 4, range 3 east; that on the 6th of April, 1829, the complainant entered into partnership with Andrew P. Vanmatre and in the month of October following he for the firm purchased of one Howe, then the owner of all the smelting privileges on said survey, all the rights and privileges thereto, and the lease from the superintendent of the lead mines to Lawrence and Bailey was assigned to Howe and by him to the complainant and Vanmatre, and said assignment included a field and crop of turnips then growing on the north-west quarter of said section; that the complainant gathered said crop of turnips and continue to occupy, possess and cultivate said field up to the 29th of May, 1830, when the pre-emption act was passed by Congress, and that under said act he and his said partner were entitled to a pre-emption right on said quarter section; that on the 1st of January, 1830, the complainant for himself and partner obtained a smelter's lease and license, and under it they cultivated a field on said quarter section and continued to occupy and cultivate it until June, 1834, in which month his partner, Andrew P. Vanmatre, died; that on the 19th day of June, 1834, complainant purchased of his legal representatives all the right and title which he had to said premises and their other partnership property, and complainant continued to occupy and cultivate the same and entered the same by pre-emption and that he had good right to enter said quarter section by pre-emption; that in August, September or October of 1834, a land office was opened at Mineral Point in which land district said premises were situated, and in October or November of that year complainant tendered to the clerk of the register and receiver of said land office a relinquishment of all pre-emption claim to the land, where he then resided, for the reason

that he wished to obtain a pre-emption to said quarter section on section 27, which relinquishment was refused by said clerk as he considered it a mere formality ; that in May or June of 1835, the lands east of the fourth principal meridian came into market, and immediately thereafter he claimed of John P. Sheldon, register of the land office, the pre-emption right of said quarter section of land, in his own right and as assignee of said Andrew P. Vanmatre, under the act of Congress of the 19th of June, 1834, and of the 29th of May, 1830, and offered to prove his said right ; that in the year 1833 the defendant, *Parkinson*, without law or color of equity and adversely to complainant and his said partner, entered upon a part of said quarter section of land and held the same until the complainant made said application to enter it by pre-emption, and at and before which time said *Parkinson* applied to enter a part of said quarter section by pre-emption, claiming to hold under one Rawson, who never had any right thereto ; that *Parkinson* endeavored to claim and prove a right thereto under and from one John Moore who never had any right thereto and entered by pre-emption elsewhere ; that when complainant applied to enter said quarter section, the register of the land office refused to permit him to enter the whole or any part thereof, and then for the first time he learned that the defendant, *Parkinson*, had applied for a part of the tract ; that afterward and when said register knew he was absent and without giving him notice, he took up and considered the question *ex parte* and awarded one-half of said quarter section to the defendant *Parkinson*, and the other half thereof to complainant, in the absence of complainant and of the receiver of said land office, after which said quarter section was divided by an east and west line and the north half was allotted to the defendant, *Parkinson*, and the south half to the complainant ; that complainant appealed from this decision to the general land office, and after vexatious delays he succeeded in getting the register to forward the

papers; that he furnished him with abundant proof of his right, which were mislaid or suppressed by said register and that they never reached the general land office, the consequence of which was that the case was referred back to the Mineral Point land office with instructions, that if it should appear that complainant and his partner, Vanmatre, cultivated said quarter section in 1833 and had possession in 1834, their right to the pre-emption was clear, as they were the two first occupants; that all this proof had been furnished to said register, whose duty it was to forward it when the case first went up; that in June or July, 1838, the register and receiver of the land office at Mineral Point sent to the general land office the case, without altering the former decision of the register or receiving any new proof from the defendant, *Parkinson;* that in 1836, the said register permitted said *Parkinson* to enter the south half of said quarter section that had been previously awarded to complainant, but complainant afterward and in 1840 got a patent for that tract; that all the proof that the commissioner of the general land office required was furnished, yet he decided adversely to the complainant, from which he appealed to the secretary of the treasury and the decision of the commissioner was affirmed, and complainant believes and charges that the commissioner kept the important facts, designedly from the secretary of the treasury; that in 1840 *Parkinson* received a patent for the north half of said quarter section, but that complainant had previously taken all legal steps to procure it, etc. The bill prayed for an injunction against the defendant, *Parkinson*, to restrain him from conveying the legal title, and that the legal title might be adjudged to be in the complainant on the ground of his superior equity by pre-emption right to the said north half of said quarter section.

The defendant, *Parkinson*, answered, and alleged that he had no knowledge of the survey made by the complainant in 1828, or of the alleged lease for said lands,

and that he did not admit the same; that he had no knowledge of the additional survey for Bailey in July, 1829; that the first survey contained a part of the quarter section mentioned in the bill; that he knew nothing of the partnership of complainant and Vanmatre, and had no knowledge of the purchase from Howe, but denied that Howe had any right in the premises, or that the assignment was made with the consent of the superintendent of the lead mines; that he knew nothing of the terms of the alleged lease from said superintendent; that he admits that in the fall of 1829 the complainant gathered the crop of turnips, but beyond this he denied that the complainant, or others for him, occupied or cultivated said grounds before 1830, and denied that complainant or Vanmatre had a pre-emption right under the act of 1830; that he had no knowledge of complainant's lease from the superintendent of the lead mines of January 1, 1830, and denies that complainant and Vanmatre possessed or cultivated said quarter section previous to 1830; admits their occupation and cultivation from about the 1st of June, 1830, to the 5th of June, 1834, when Vanmatre died; that he had no knowledge of the sale, from the representatives of Vanmatre to complainant, of June 19, 1834, but believes that the sale was subsequent to that day, that the bill of sale was fraudulent, and made to prevent defendant from obtaining a pre-emption of said land; admits that this tract of land was not reserved from sale, and denies, upon his belief, that complainant tendered to Ochiltree, clerk of the land office, a relinquishment of complainant's right to a pre-emption on the lands where he lived; admits the reservation of section 28 from sale, and charges that it was done at the instigation of the complainant, and that the complainant had a good pre-emption claim to the south-east quarter of that section, and might have entered it; admits that complainant made a pre-emption claim to the quarter section on section 27 in his own right, and as assignee of Vanmatre, under the act of May, 1830, and

denies that he had any claim under the act of June, 1834; admits that he (defendant) entered a part of said quarter section May 3, 1833, by virtue of a conveyance from one Ransom, who derived title from one Moore, in 1832, and insisted that Moore was the first settler on the quarter section, and settled there in 1828, before the alleged surveys; that defendant occupied and cultivated said premises from May 3, 1833, to the 19th of June, 1834, and was, under the act of June, 1834, entitled to enter the quarter section in question jointly, said Vanmatre having died before June 19, 1834; admits that he applied for a pre-emption right to a part of the quarter section, which was allowed to him as to the north half thereof, which he entered, and in 1840 received a patent therefor; denies that he was unable to prove any right under Moore, and insists that Moore sold to Ransom in 1832, and Ransom to defendant in 1833; that he had no knowledge of the allegations as to proceedings in the land office on application of complainant, and denies that the said decision was fraudulently obtained, or was against the rights of complainant; knows nothing of the appeal to the commissioner of the general land office, or whether any proofs or papers were mislaid or suppressed, and does not admit that such was the case; does not admit that such instructions as are alleged were given by the commissioner of the general land office to the register and receiver at the Mineral Point land office, and denies that complainant ever furnished sufficient proofs of his claim, or that he could do so; denies that, at the second hearing, no proofs were furnished by him (defendant) to prove his claim; admits that, in 1836, he was permitted to enter the south half of said quarter section, but denies that the entry was made pending an appeal to the general land office; denies all knowledge of the second commitment of the case to the commissioner of the general land office, or of his decision, or of an appeal therefrom to the secretary of the treasury, or of his decision thereon, and denies that the commissioner or secretary of the treasury, or any other power,

had authority to review the decision of the register and receiver of the Mineral Point land office, and insists that their decision was and is final and conclusive; sets up that he has been at great expense in making improvements on the premises, and that he should be compensated therefor in case of a decree against him.

The complainant filed a general replication.

It appeared, from the evidence and the records of the general land office in relation to the tract in question, that, on the 1st of August, 1828, the complainant surveyed, for Isaac Reed & Co., the three hundred and twenty acres mentioned in the bill; that Lawrence & Bailey sold to Alden R. Howe, March 3, 1829, and on the 21st of October, 1829, Howe assigned to the complainant; that, on the 1st of October, 1829, the superintendent of the lead mines leased the premises to complainant; that, in the survey, Moore was included, under an understanding that a partnership was to be perfected (which was not carried out) to keep a tavern. Moore sold by quitclaim deed to Ransom all of the premises on the east side of the old Dodgeville road, and nothing on the west side except the rails, and Ransom said he would make his farm on the east side of the road, and would not interfere with any claim on the west side of the road; that the complainant and Vanmatre purchased of Howe, who bought of Lawrence & Bailey in 1829, and took possession the same year, and gathered the crop of turnips that year; that complainant and Vanmatre broke six or seven acres of the land in 1830, and continued in possession, cultivating, until 1834, when Vanmatre died June 5, 1834, and on the nineteenth of the same month, his administrators sold his interest to the complainant; that the first improvement was made by Moore and Reed & Co.; that Moore never broke on the survey more than three acres, and when he sold to Ransom he was in possession of eight acres broke by Lawrence & Bailey, which he surrendered to the complainant; that Moore sold nothing on the survey to Ransom but the rails, his sale to Ransom

having been made in the spring of 1832, and Ransom said
he would make his farm off the survey entirely. Ransom
sold to *Parkinson* May 3, 1833, and *Parkinson* occupied
and cultivated part of the quarter section from that time
on. One of the letters from the register and receiver of the
land office at Mineral Point to the commissioner of the
general land office, dated January 14, 1836, contains an
inquiry whether they might be permitted to allow *Par-
kinson* to enter the south half of the quarter section on
which were complainant's improvements, to retaliate
upon him for entering a piece elsewhere, upon which
Parkinson had improvements. On the 21st of Jan-
uary, 1836, the register and receiver of the land office
at Mineral Point sent a communication to the gen-
eral land office, with the papers in the case. On the
28th of April, 1837, the commissioner of the general
land office wrote the register and receiver at Mineral
Point, returning the case for further proofs, saying, that
if *Bracken* and Vanmatre cultivated the premises in
1833, and occupied them June 19, 1834, they were en-
titled to the land, and that the settlement by Moore could
not avail *Parkinson*. The commissioner directed new
proofs to be taken, upon notice to the parties. It ap-
peared that the register refused to give complainant a
copy of these instructions. On the 6th of January,
1838, the commissioner of the general land office wrote to
the register and receiver at Mineral Point to send up a
report of their proceedings, and expressed surprise that,
pending the decision on the subject, they should have
allowed *Parkinson* to enter the south-half of the quarter
section. July 31, 1838, the register and receiver sent to
the general land office the papers and their decision,
giving the north half to *Parkinson*, as formerly, confirm-
ing their original decision, dated July 28, 1835, and it
was drawn up and signed by John P. Sheldon, Register,
to which is appended the following : "From the testimony
adduced by both parties in the above case, I concur in
the decision as above rendered." (Signed) "Joseph Encix,

Receiver." This concurrence is not dated, and from the deposition of Parris, afterward register, it appears that the original, on file in the land office at Mineral Point, had no signature but that of the register.

The venue of the cause was changed to Dane county, and at the hearing, the district court for Dane county decreed that the bill be dismissed, with costs, from which decree the complainant appealed.

*T. P. Burnett* and *Edward V. Whiton*, for appellant.

1. The complainant claims under the acts of 1830, 1832, and 1834, by virtue of the first settlement and cultivation, the cultivation in 1829 being by himself and Vanmatre, and by himself up to 1835. There can be no doubt but they were the first two actual settlers. It is proved that Vanmatre's interest was assigned to the complainant and he bought the possession and succeeded to his rights. The claim of *Parkinson* on the ground of occupation and cultivation in 1833, is derived by purchase from Ransom who bought of Moore, and he could acquire no right for the reason that he entered by pre-emption elsewhere.

2. The allegation that the matter was decided by the register in the absence of the receiver is not answered, and the proof shows that such was the fact. The instructions from the general land office were not complied with, but were entirely disregarded. The register was not competent to decide the case for it was not submitted to *his* decision. The case was not proceeded with according to law. The law contemplates a joint hearing and a joint decision by the register and receiver, and a decision made by the register and a subsequent assent by the receiver is not such an adjudication as is contemplated by law and will not conclude the parties.

*Moses M. Strong*, for appellee.

1. The whole controversy has already been decided by the government officers and is *res adjudicata*. The case went up by appeal to the highest authorities in the department and has been decided in favor of the defendant.

13 Pet. 511. Opinions of the Attorney General, April 21, 1836, and April 30, 1836. Decision of Secretary Woodbury April 14, 1836. This court cannot review the matter as an appellate tribunal.

2. But upon the proofs, the defendant's rights were as good as the complainants. In 1829 the land was not the subject of pre-emption because the Indian title had not been extinguished. By Vanmatre's death his rights were extinguished so far as a pre-emption was concerned. *Bracken* and *Parkinson* were in reality the two first settlers, and were entitled to divide the quarter section between them, and this was the result of the decision of the department and they are now bound by it.

MILLER, J. *Charles Bracken* filed his bill on the chancery side of the district court against the defendant, *Daniel M. Parkinson*, for the purpose of obtaining a decree to vacate a patent issued by the United States to said defendant. It appears in said bill, the answer of the defendant, as well as in a great mass of testimony, that the parties severally claimed a pre-emption for a quarter section of land; that, after repeated investigations and trials before the land officers at Mineral Point, during a period of about six years, the said land officers reported the testimony taken before them, with their opinion, recommending a division of the quarter section between them, assigning to each the portion which he claimed to have improved. After an additional investigation, a similar report and opinion of the said officers were adopted by the commissioner of the land office, and approved by the secretary of the treasury after a thorough examination of the evidence. In pursuance thereof, patents were issued to the respective parties. To vacate the patent to the defendant, this suit is brought.

By the act of congress, prior to any entries being made under the privileges given, proof of settlement or improvement shall be made to the satisfaction of the register and receiver of the land district in which the lands now

lie, agreeably to the rules to be prescribed by the commissioner of the general land office for that purpose. It being necessary that some tribunal or authority should be created to take the proofs, and pass upon them as presented by the claimant, for the benefit of the law, the land officers were very properly, and according to the policy of the government in disposing of the public domain, authorized to perform this duty. The policy of the government is, to dispose of the public lands in such a plain and simple manner that every person, however illiterate, can transact his own business at the land office, without expense or unnecessary trouble, or the risk of litigation. It is also the policy to consider the acts and reports of the land officers, in the discharge of their duties, to be subject to the supervisory powers and control of the government at Washington, as the party from whom the title is to pass.

In the case of *Wilcox v. Jackson*, 13 Pet. 511, the supreme court of the United States, in answer to the argument that the decisions of the land officers in cases of pre-emption are conclusive, remarks, "that the acts of congress have given to the registers and receivers of the land offices the power of deciding upon claims to the right of pre-emption; that upon these questions they act judicially; that no appeal having been given from their decision, it follows as a consequence that it is conclusive and irreversible. This proposition is true in relation to every tribunal acting judicially, while acting within the sphere of their jurisdiction, where no appellate tribunal is created; and even when there is such an appellate power, the judgment is conclusive when it comes collaterally in question, so long as it is unreversed." From these remarks it is inferred that this decision sustained the proposition that there is no supervisory power over the opinions or acts of the land officers. We do not believe that the court so decided, or intended so to decide. The satisfaction of the officers upon the evidence is to be considered conclusive generally, and for all purposes re-

quired to insure to the claimant his title. It cannot be inferred or presumed that congress intended their finding in a case of pre-emption to be so conclusive as to require the government to issue the patent, or to deprive the courts of the power to administer justice between the parties. The inherent power of the courts is not to be destroyed by implication.

Congress has the sole power to declare the dignity and effect of titles emanating from the United States, and the whole legislation of the government in reference to the public lands, declares the patent to be the superior and conclusive evidence of legal title. At law, the patent is conclusive. But if those who claim to hold the land against the patent can show that it issued by mistake, then the equity side of the court is the proper forum, and a bill the proper remedy to investigate the equities of the parties. *Bagnell v. Broderick*, 13 Pet. 436.

The case of a pre-emption is different from that of a mere private entry. In the latter, a mistake would, probably, be merely clerical, and easily corrected. In the former, an investigation of proofs is required ; the mind has to deliberate and pass upon the facts proven, and form a conclusion. In this the land officers act *quasi* judicially, and for this reason their decisions should not, after the title has passed, be disturbed, unless where they act beyond their jurisdiction or power, or in cases of fraud, or conclusive mistakes. When they act within their sphere or jurisdiction, every legal intendment is to be made in favor of their decision, and it is the duty of the court to require of the party complainant to make out a clear case of fraud or mistake. We cannot go into a detailed statement of the facts in this case, but we have examined the pleadings and evidence with diligence and care, and are fully satisfied that this is not such a case, either of fraud or mistake, as to authorize this court in disturbing the patent of the defendant. It is, therefore, considered by the court that the decree of the district court, dismissing the complainant's bill, be affirmed.