The judgment of the court was pronounced by
Rost, J.
This is a petitory action, in which the plaintiff claims several tracts of land forming part of a plantation in the actual possession of the defendant. There was judgment in favor of the plaintiff for a portion of the land; and the defendant appealed. The plaintiff has asked that the judgment be amended and rendered in his favor agreeably to the prayer of his petition.
The plaintiff purchased from the State several blank warrants under the 7th section of the act of the Legislature, approved on the 25th of March, 1844, which authorizes the State register to issue warrants for lands to be granted to the State of Louisiana under the 8th section of the act of Congress of the 4th September, 1841. These blank warrants were afterwards located by the plaintiff on the lands claimed in the United States’ land office, from which he obtained two certificates of location. Patents were subsequently issued for those lands by the State under the section of the act of 1844, already referred to. This action is brought on these patents.
The defendant’s title must now be considered. By the 2d section of the act approved the 29th March, 1830, when two persons had settled upon the same quarter section of public land, they were each entitled to one divided half of this section, and to a preémption of eighty acres elsewhere in the same land district. *87 The settlers generally retained the land which they occupied, and sold the unlocated portion of their preemption right, popularly named a “float,” to speculators who selected the land and located the floats on it.
In 1844, this act was revived to continue in force for two years in favor of persons who were settled on the public lands during the year 1833. Under this act, Thomas Barrett and Robert Bell purchased a number of floats, and located them on the land in dispute and on adjoining tracts. Those locations were approved by the land office at the time they were made; and since the institution of this suit patents have issued upon them. In 1836, Barrett sold his undivided half of the land to Bell, who established a sugar plantation upon it. The defendant holds under Bell by a regular chain of conveyances.
The nature and extent of the powers of Congress over land titles emanating from the United States, are too well settled to be considered open questions. They are stated as follows by the Supreme Court of the United States : “ Congress has the full power to declare the dignity and effect of titles emanating from the United States, and the whole legislation of the government in reference to the public lands, declares the patent to be the superior and conclusive evidence of legal title. Until it issues the fee is in the government, which, by the patent, passes to the grantee. Where a patent has not been issued for a part of the public lands, a State has no power to declare any title, less than a patent, valid against a claim of the United States, or against atitle held under a patent granted by the United States.” Wilcox v. Jackson, 13 Peters, 498. Bagnell v. Broderick, 13 Peters, 436.
To avoid the effect of these decisions, the plaintiff must establish affirmatively that, under the act of 1841, the United States were divested of their title by the State location in the land office at New Orleans, without the necessity of a patent or of any other formality; and failing in this, he must show that the location amounted to an equitable title, and that the patents of the defendant were issued in violation of law. The section of the act of 1841, on which he relies, is in these words: “There shall be granted (to each State specified, Louisiana being one of them,) five hundred thousand acres of land for the purposes of internal improvement. The selection in all the said States to be made within their limits respectively, in such manner as the Legislature shall direct, and located in parcels conformably to sectional divisions and subdivisions of not less than three hundred and twenty acres in any one location, on any public land, except such as is or may be reserved from sale by any law of Congress or proclamation of the president of the United States ; which said locations may be made at any time after the lands of the United States in said States shall have been surveyed according to existing laws.”
There is nothing in it which can at all be construed into a surrender of the power of the United States to see that the locations were properly made; whether the lands selected had previously been surveyed; whether they were reserved from sale or subject to other claims; and whether the selections were made in parcels conformably to the sectional divisions and subdivisions, and of not less than three hundred and twenty acres in any one location, were questions not submitted to the arbitration of the State, and therefore reserved to the secretary of the treasury.
We have beenreferred, in argument by the defendant’s counsel, to the letters of acting Commissioner Piper, found in the record. He states the practice of the land department under the act of 1841, to be as follows : “The State is authorised under the law to make certain locations, and it is with the State authority, *88 and not with the purchaser, that this office has to treat. If the State selects a tract of land, and it is rejected, the cause of its rejection is communicated and the State has no further control over it. If it be approved, the approval is communicated and the State can dispose of it in such manner as it may think best. But if the State disposes of a tract of land before its approval, and the selection is rejected, the purchaser has to look to the State for redress, and not to the general government.” We believe those regulations to be in accordance with the act of Congress.
It is not necessary to determine, in this case, the force and effect of the State patents; but it is obvious that they should not have issued before the locetion was approved by the secretary of the treasury. Those patents bear date the 20th April, 1846. On the 0th March preceding, the commissioner of the general land office had written to the register and receiver at New Orleans, as follows: “As Congress has taken the subject of the floating preemption entries arising from preemption settlements within the limits of the Houmas private claim into consideration, and is about to confirm them in the hands of bona fide assignees, I deem it proper, in order to prevent future inconvenience to direct that all the land embraced by such entries, except as to those where the purchase money has been refunded and the claim abandoned, be hereby considered as excused from disposition in any way, either by State selection or otherwise. The State selections already made will be suspended to await the action of Congress. If the contemplated law confirms all entries in the hands of bond fide assignees, it will, in all probability, defeat all locations made by State selections. In the mean time, it is necessary that all appropriations of the land covered by such entries be suspended.”
The selections made in behalf of the State, so far from having been approved were suspended at the time the State patents issued. The governor was not apprised of the suspension when he signed them; and it is shown that he did so not because he was convinced of their validity, but in order that the question might be judicially determined.
The acting commissioner of the land office, Mr. Piper, paying no regard to the State patents, laid the selections made by the plaintiff before Mr. Secretary Walker for his approval, on the 28th of January, 1847. Mr. Walker took the matter under advisement. On the 24th February following, at the request of Mr. Johnson, a senator from Louisiana, the commissioner referred to his decision, the conflicting claims of the preemption entries and of the State locations, which form the subject of this controversy. The decision of the secretary of the treasury is contained in the following letter to the commissioner, bearing date the 28th of June, 1847: “ Sir, In reply to your communication of the 24th of February last, with respect to conflicting claims to land under floats in Louisiana and selections made by that State, I would state that I propose to approve the locations made under the floating claims held by the actual settlers and improved by them, in preference to the State locations made subsequently and covering those improvements.”
It appears, then, that the State locations have been disallowed by the proper authority and that the floating claims on which the patents of the defendant rest, have been preferred to them.
We have been referred in the brief to the cases of Brown's Lessee v. Clements, 3d Howard, 575, and Levy v. Thompson, 4th Howard, 19. In these cases Congress had sold the land and the purchasers had complied with all the formalities required and obtained patent certificates. The Supreme Court of the *89 United States held, that if there was no error or fraud in the issuing of the certificate's, they formed avalid tide, and Congress had no right to refuse patents. But in this case the United States have not sold the land ; they have merely agreed to give it to the State, when the location of it is finally approved by the land department; and until that approval is had, they have nothing to do with the contracts which the State has entered into with individuals in relation to it.
We are ef opinion that the State location and the warrants issued upon it by the land office at New Orleans, did not divest the United States of their title.
The only question remaining is, whether the patents of the defendant issued contrary to law. For if they did not,- under the decisions in 13 Peters referred to, the plaintiff has not such an equitable title as will support a petitory action. It is doubtful whether he could have such a title under any circumstances. It is necessary to a proper understanding of this part of the case that we should advert to the facts upon which it rests^
The mother claims, from which the floats of Bell and Barrett Were derived, are within the boundaries of the Houmas claim. This claim, as originally filed for confirmation with the board of commissioners, is represented as extending from the Mississippi river to the Amite, between widely diverging side lines. It was confirmed by the board, and also by an act of Congress passed in 1814. But in 1829, Mr. Graham, then commissioner of the general land office,- construed the confirmation as recognizing simply the validity of the grant, and leaving Congress to determine the extent confirmed, he ordered the claim to be surveyed with a depth of one and a half leagues, and instructed the register and receiver at New Orleans to treat all beyond that depth as public land, subject to settlement and entry. In consequence of this decision, which remained undisturbed until 1836', a great many settlements were made in the rear of the survey, and amongst others those in which the defendant’s title originated.
In 1836, a subsequent commissioner of the general land office directed the register and receiver at New Orleans to withhold from sale all the lands within the claimed limits of the Hoftmas grant; in 1840, Mr. 'Woodbury, then secretary of the treasury, directed the land office to take no further step in relation to the Houmas claim itself, until Congress should have further opportunity for legislative action ; and in 1841, the register at New Orleans was directed not to issue a patent certificate upon it. That certificate was issued by his successor, notwithstanding the prohibition. Mr. Spencer, the next secretary of the treasury, states officially that the patent certificate had been issued, not only without authority, but against the express instructions of the commissioner of the general land office, and that a knowledge of the erroneous and unauthorized issues is believed to have been brought home to the holders.
When Mr. Spencer was superceded by Mr. Bibb in the department of the treasury, a radical change took place in the policy of the deportment. The new secretary wrote out an elaborate decision in favor of the Houmas claim; approved the issuing the patent certificates and directed the patents to be issued : which was accordingly done.
In 1844, the acting commissioner wrote to the register at New Orleans, that in consequence of this decision another private claim included within the limits of the Houmas grant had been cancelled; and stated that all such entiles were necessarily void. The letter goes on to say: “I take this occasion to advise you of the determination of the Houmas claim, in order not only that you may be enabled promptly to dispose of any claims which may hereafter be made for any *90 of the land within its limits, but also that the parties who are interested in entries already made may be advised by you that those entries have been cancelled, and that the purchase money will be refunded to them upon proper application.’’ No notice was given to the defendant, and he remained in possession of the land.
In 1845, the register at New Orleans wrote to the commissioner that an enquiry had been made by the locating agents of the State, whether the land in controversy could be taken up,, under theact of 1841, or whether the State was excluded, as well as preSmptors, from acquiring a title to these lands by the act of Congress of the 26th August, 1842. The reply was, that the cancelled entries were public lands, and could, as such, be'entered by the State. The location was accordingly made.
As soon as the defendant was apprised of these proceedings, he. filed a caveat in the State land office. Soon after, the commissioner of the general land office wrote to the chairman of the committee of private land claims in the House of Representatives, on the subject of the' floats arising from the claims within the Houmas grant, viewing them as not cancelled, and recommending that they should be confirmed in the hands of bond fide holders; he also addressed to the register and receiver at New Orleans the letter already mentioned, directing those officers to suspend all appropriations of the land covered by those claims.
On the 3d of August, 1846, and in the session of Congress pending which the floats on the Houmas claims had been recommended for confirmation, an act was passed entitled “an act providing for the adjustment of all the suspended preemption land claims in the several States and Territories.” It is under that act that the patents of the defendant were issued.
The plaintiff now contends, that the entries under which the defendant claims, were not suspended entries, within the meaning of that act; that they were made in violation of law upon lands not subject to entry, and therefore absolutely void from the beginning; that the entiles being void, the floating claims of which they were the basis fell with them ; and that the patents of the defendant were issued in violation of the proviso found in the act of Congress of the 3d March, 1811; that the department, whose special duty it was to pass upon the entries, had officially declared them to be void, and that the special tribunal created by the act of 1846, was without jurisdiction to recognise their validity.
We are not prepared to concede that the entries were originally made in violation of law. The proviso in the act of 1811 is, that until the final decision of Congress thereon, no tact of land shall be offered for sale, the claim to which has been in due time, and according to law, presented to the recorder of land titles in the district of Louisiana, &c. It is true that the Houmas claim had been thus presented. But the plaintiff admits that it was acted upon and confirmed by the act of the 18th of March, 1814. This confirmation satisfied the proviso of the act of 1811.
Congress, by the act of 1814, limited the grant to the number of acres con. tained in one league square, and as no further claim appears to have been made by the grantees during the twenty-two years which followed its passage, Mr. Commissioner Graham was justified in considering the decision of Congress as final upon the whole claim, and the lands not confirmed as public lands.
It is not pretended that the mother claims, out of which those of the defendant arose, were included within the extent confirmed. We are therefore of opinion that they were not originally illegal.
We cannot view the letter of the commissioner informing the register and receiver at New Orleans in 1844, that the entiles made on the Houmas grant *91 ■were cancelled and his opinion that the land was subject to entry by the State, in the light of a judgment binding upon any body. He had no authority to make such a decree. In the alienation of the public domain, where there are no conflicting claims to be determined, the officers of the land office exercise a portion of the administrative power of government; their decision against a claim is nothing more than a refusal to recognise it, and does not prevent the claimant from renewing it at any subsequent time. The defendant never was notified as directed by the letter of the commissioner, but remained in possession and continued to urge his claim till he succeeded in having itrecognized. Notwithstanding the decision of the commissioner in this case, it is clear that his successor, Judge Shields, considered the claim as still in existence in 1846, when he directed the State entiles adverse to it to be suspended.
Mr. Secretary Walker also viewed it as an existing and suspended claim, when he proposed to approve it in preference to the State locations.
From the evidence in the record the inference is irresistible, that the act of 1846 was passed to meet this veiy class of cases; and there is nothing in the wording of it which limits the general import of the preamble. The first section provides that the commissioner of the general land office be, and he is hereby authorised and empowered to determine upon principles of equity and justice, and in accordance with general equitable rules and regulations, to be settled by the secretary of the treasury, the attorney general and commissioner, conjointly, consistently with such principles, all cases of suspended entries now existing in said land office, and to adjudge in what cases patents shall issue on the same. That section contains the following proviso: “Provided, however, that such adjudications shall be made within two years from the passage of this act, and be first approved by the secretary of the treasury and the attorney general, and shall only operate to divest the United States of the title to the land embraced by such entries, without prejudice to the rights of conflicting claimants.”
The patents of the defendant have issued in strict conformity with the requirements of this section ; and we are of opinion that he has the better title.
We have been induced to spend an unusual length of time in the investigation of this case, on account of the earnestness with which the claim of the plaintiff has been pressed upon us. We believe the decision to be correct; but supposing the case to be doubtful, and nothing more can be pretended, the doubt must inure to the benefit of the defendant.
It is therefore ordered that the judgment in this case be reversed, and that there be judgment in favor of the defendant for the land in controversy, with costs in both courts.