On Beheabing.
Taliaferro, J.
The litigants in this case present adverse titles, derived from conflicting patents to the same tract of land — the plaintiff claiming under patent from the State of Louisiana, the defendant under patent from the United States.
*434 Under the provisions of the eighth section of the act of Congress ol September 4, 1841, donating lands to 'several of the States for purposes of internal improvement, the land in controversy in this case, togetliei with various other parcels, was selected under the authority of the State, and the “ selections ” were approved on the 24th'of May, 1858, by the Secretary of the Interior, “ subject to any valid legal rights that maj exist thereto.”
On the 16th of May, 1856, Dorcas Dinkgrave, plaintiff’s vendor, located an internal improvement warrant on the land in litigation; and afterwards, on the 7th of December, 1857, this warrant was relocated on the same land by plaintiff. On the 13th of August, 1858, the State patent issued in favor of plaintiff as assignee of Dorcas Dinkgrave.
This land lies within the Bastrop grant, the validity of which remained undetermined from the time of the cession of Louisiana from France to the United States, until December, 1850, when the Supreme Court of the United States decided adversely to the grant. The extensive body oi land, embraced by this'grant, was held during this long period in reservation, and becoming, by the decision of the Supreme Court of the Unitec States, part of the public domain, Congress in March, 1851, passed at act for the relief of the bona fide settlers in the DeBastrop grant. The act provides: 1. For those who hold the rights of the original emigrant: under the Baron. 2. For those who had cultivated the premises fo: twenty years under a chain of titles from DeBastrop; and 3d. For those who settled in good faith, and who, but for the reservation, would hav been entitled to pre-emption rights under some one of the previous!; existing pre-emption laws.
Wiley J. Tester, whose heir and administrator the defendant in thi case is, claiming to be entitled to a pre-emption right under the third class of those provided for by the act of Congress of 3d March, 1851 filed his declaratory notice at the proper land-office, on the 9th of Octo ber, 1855, dating his settlement in 1849. After various vicissitudes o approval and rejection of his claim, which it may be neoessary furthe on, to notice in detail, Tester succeeded in procuring a decision grantinj his pre-emption, and a patent was issued after his decease to his heirs oi the 7th of December, 1859.
This suit was brought in April, 1859, and judgment was rendered i favor of the plaintiff in July, 1860. The defendant appealed. Actio: was taken on this appeal in February, 1862, and the opinion then rea was prematurely reported — an application for a rehearing being the: pending. At the July term, 1866, of this court at Monroe, the applies tion was granted, and the case is now before us on a rehearing.
The defendant resists the plaintiff’s claim, chiefly on the ground thi he has priority of right under the pre-emption laws, and that his rig! was perfected by the patent granted to'him by the United States; thi although the State patent, under which plaintiff claims, is of anteric date to that issued to the defendant .by the United States, the Stat patent only passed title to the land in dispute, subject to defendant prior right by pre-emption privilege, as this existed at the time the lan was transferred by the United States to the State of Louisiana. He coi tends that the validity of the government patent and his rights under i *435 can not be enquired into in this action; that the patent being final and conclusive, as to the question of title, which plaintiff is not at liberty to open, and especially as he does not allege error or fraud.
The plaintiff holds that the approval by the Land Department atWasliington of the list.of lands, (among which is the tract contended for by tlic parties) to be transferréd to the State under the donation act of 1841, vested in the State the title to those lands in fee-simple; that the approval of the selections constitute the patent to the State; that after the approval of the State selections and the consequent divestiture of the title of the United States, the question of defendant’s pre-emption claim became res adjiiiliciiia; and if not by the approval of the selections and the decision of the Commissioner of the General Land Office adverse to the pre-emption claim, it became so by the public land sales in June, 1858, previous to which time defendant had failed to make satisfactory proof of his preemption, or to appeal from'the decision rendered against him in September, 1857. He, moreover, contends that the Secretary of the Interior, by his approval of the “selections,” exhausted his power over the subject; that he became ‘ functus officio quoad hoc, and that his • subsequent action in the premises is void.
It is clear that if Yester was, according to the provisions of law, entitled to a pre-emption, and that right accrued before the approval of the land to the State, he would be bound to recover or hold the land, notwithstanding the State patent was issued before his right was established, provided, he has not forfeited his pre-emption by failing to fulfil the conditions upon which the right is granted.
That the approval of the selected lands must be considered as vesting title to these lands in the State, we feel bound to concede. But we must equally concede, that the title passed subject to any equitable rights that may have existed at the time of the approval to any portion of the lands iransferred. Such equitable rights are reserved by the act of, approval. But is there reserved also to the Land Department, the power to annul ;he vested title of the State by subsequently conferring upon other paries an unconditional and conclusive title to the same land? If so, the tenure of the State would seem to be nugatory. Subsequent action by ihe department, upon outstanding claims affecting lands already trans-erred, would be of the nature of ex parle proceedings.
In the present case, the plaintiff had notice of the reinvestigation of he defendant’s pre-emption claim, and introduced evidence; but he did o under protest, excepting to the right of the Land Department to take ,ny further proceedings in the case.
The questions presented seem to be, did the issue of the United States latent, ipso facto, annul the State patent? Was the decision of the Secreary of the Interior, in favor of Yester, final and conclusive? Or, was it. ierely a final disposition of the matter, so far as the United States was oncerned? If it be legitimate for the Land Department to settle unadisted rights, and in its discretion to issue other a,nd conflicting patents, bould we not consider such action, rather as the’relinquishment on the art of the government of all further jurisdiction over the subject-matsr, and as leaving the parties in interest to '.contest their rights before . ther tribunals, than as deciding in the last resort, superiority of title? *436 Such is the course adopted by the government, in regard to conflicting titles under Spanish grants. Where the United States Commissioners have issued certificates to several claimants for the same land, the register and receiver of the proper office form a court to decide priority or superiority of right, and the government grants the patent accordingly, leaving the contending parties to the State courts for the final adjudication of their claims.
Be this as it may, a careful examination of numerous authorities, satisfies us that in such cases, courts have the right to look into the character of the conflicting titles, and to pass upon their validity. The Supreme Court of the United States sanctioned this doctrine in the case of Bodley v. Taylor, 5 Cranch, p. 191, where it recognized the right of a court of equity to decide controversies growing out of conflicting patents from the State of Virginia, issued upon land warrants granted by the State to individuals.
In that case, Chief Justice Marshall, said: “ The defendant, in the court below objects to the jurisdiction of a court of equity, and contends not only that the present case furnishes no ground of jurisdiction upon general principles, but ■ that the land law under which both titles originate, in giving a remedy by which rights under entries might be decided previous to the emanation of a patent, has prohibited an examination of the same question after a patent shall have issued. Had this been a case of the first impression, some contrariety of opinion would perhaps have existed on this point. But it has been sufficiently shown, that the practice of resorting to a court of chancery, in order to set up an equitable, against the legal, title, received in its origin the sanction of the Court of Appeals, while Kentucky remained a part of Virginia, and has been so confirmed by an uninterrupted series of decisions, as to be incorporated into their system, and to be taken into view in the consideration of every title to lands in that country. Such a principle cannot now be shaken.”
The same Court, in the case of Garland v. Winn, 20th How. Rep. p. 7, announces that “ the general ruléis, that whenever several parties set up conflicting claims to property with which a special tribunal may deal, as between one party and the government, regardless of the rights of others, the latter may come into the ordinary courts of justice and litigate the conflicting claims. Such was the case of Gomegys v. Vasse, 1 Peters, 212; and the case before us belongs to the same class of ex parte proceedings; nor do the regulations of the Commissioner of the General Land Office, whereby a party may be liear<;l to prove his better claim to enter, oust jurisdiction of the courts of justice. We announce this as the settled doctrine of this court.”
To the samé purport are the cases 9th How. 328, 14th How. Cunningham v. Ashley, and Elliott et al. v. Pursel et al., 1 Peters, 340. A decision in point was rendered in Illinois, in 1857, in the case of James G. Walker and John R. Smith v. Jacob Hedrick. In that case Hedrick had a patent granted upon a pre-emption claim. Plaintiff’s claim rested on a prior entry. The question was, had Hedrick a pre-emption in law that would affect the plaintiff’s prior entry? The question opened the right of Hedrick to a pre-emption, and the Court decided against his right, saying: “ It may be remarked, that while the decision of the register and receiver *437 upon the facts of settlement and cultivation, etc., is final, or only reversible on appeal, yet their decision, as to their jurisdiction of the case or' right of pre-emption is open to attack in any collateral proceeding before any court having jurisdiction of the property or parties.”
A similar decision was rendered in Missouri, in the case of Page v. Schibel, 11 vol. Missouri Reports, p. 167, Attorney General Legare was against the legality of issuing a second patent before the first was judicially annulled. On this subject he remarked: (4 vol. opinions of Attorneys General.) “Supposing patents to land already issued, covering the very lands in question, the executive department is, in my opinion, under the general rule, fundus officio in the premises, until its former act be judicially set aside.” In the same volume he says: “But where the act of issuing it (the patent) is complete, and the patentee will not give it up to be cancelled, it is, in my opinion, a good title at law, until judicially avoided.” In this view Attorneys General Clifford and Crittenden concurred.
On this question the decisions in this State have the same bearing. In the case of Wiggins v. Guier, 13 A. p. 356, the plaintiff held, under a State patent issued by the Governor of Louisiana, predicated upon a location approved by the Secretary of the Interior. He alleged fraud against the defendant, claiming under a government patent founded on pre-emption. It was somewhat doubtful, whether in that case the approval of the selected lands was unconditional or not. Chief Justice Merrick said: “But whether the approval was absolute or subject to the rights of others, we are of the opinion that the State of Louisiana had, and the plaintiff through the State has the better right, and that whatever title the defendant may have acquired under the patent issued in favor of the heirs of Elijah Dempsey, should be held to inure to the benefit of the plaintiff, and that the judgment of the lower court ought to be affirmed. The State of Louisiana, whether the approval of the Secretary of the Interior were absolute or conditional, as just observed, acquired a vested right which could not be defeated, except by a real right on the part of those whom the defendant pretends to represent. ”
The same doctrine was afterwards affirmed by the Chief Justice, in the case of Knox v. Pulliam, 14 A. 134. The controversy, in that case, was between a pre-emption claimant and his adversary holding under a patent from the State. ...
The defendant, in the case at bar, refers us to the case of Foley v. Harrison, 5 A. p. 75, as sanctioning the opposite doctrine. In this ease the plaintiff claimed, under State patents issued upon warrants located upon United States lands, donated to the State by the act of Congress of September, 1841. The defendant set up title under what are termed “ float claims,” located upon the land sometime previous to the location of the State patents, and upon these float-claims defendant, after the institution of the suit, obtained the government patents.
In delivering the opinion of the Court, Judge Rost cites the cases of Wilcox v. Jackson, 13 Peters, 498, and Bagnel v. Broderick, same vol. 436, lecided by the Supreme Court of the United States, and quotes as folows: “ Congress has the full power to declare the dignity and effect of iitles emanating from the United States, and the whole legislation of the *438 government in reference to the public lands, declares the patent to be the’superior and conclusive evidence of legal title. Until it 'issues, the fee is in the government, which, by the patent, passes to the grantee. 'Where a patent has not been issued for a part of the public lands, a State has no power to declare any title less than a patent, valid against a claim of ‘the United States ox against a title held under á patent granted by the"-United States.”
“ To avoid the effect of these decisions, Judge Rost announced that the plaintiff must establish affirmatively, that under the act of 1841, the United- States were divested of their title by the State location in the land office at New Orleans, without the necessity of a patent or of any other formality; and failing in this, he must show that the location amounted to an equitable title, and that the patents were issued in violation of law.”'
In regard-to the case of Foley v. Harrison, it seems that before the approval of the locations the State patents issued, and not only before the* approval, but even when the locations were suspended by instructions from the Land Department to the register and receiver, to make no further appropriations of land within the Houma grant, until the further action of Congress upon the subject. The party in that case, having the government patent, held the only title from the government, as it was clearly'- shown that his adversary obtained no title through the State. The base',’therefore, differs in:a very material point from the one'now before the 'court.
Coming now to the consideration of the defendant’s claim to a preemption, we find that in 1849, Wiley J. Vester bought an improvement withiil the Bastrop grant, and with it several slaves from one McFarland. On this pblac'e, at the time of his purchase, were several buildings, and amOngthem a dwelling-house and cotton-gin. Tester resided upon this place until his death. Cultivation was carried on upon this place, part of the-tinie as it appears, in the' name of Wiley J. Tester, and part of the time-in the name of his brother, Solomon Tester.
By a deed duly proved, and of record, W. J. Tester sold on the 22d of Mafblr, -1855;-to Solomon Tester, all his property, including the place he resided upon, and - on which he claimed a pre-emptidn right. On the 9th of October, 1855, as we have seen, W. J. Tester filed his notice at the land-office of the district. On the 16th of September, 1856, he appeared- at the office to make proof. His evidence was received, and he obtained Until the 19th of the same month to present some further testimony; which it seems he produced on the 20th of the same month. 'On the ‘16th of May, 1856, about four months previous, Dorcas Dinkgrave located her internal improvement warrant upon the land. The register and' receiver, upon their examination of Tester’s testimony, disagreed in opinion as to its sufficiency. In September, 1857, the Commissioner of the General Office decided against the claim. Eight months after the decision of the Commissioner, the list of selected lands, No. 50, embracing the-land in contest, was approved by the Secretary of the Interior on the 24th of May, 1858, upon the report made to him by the Commissioner,1 that't-here-appearéd no objection to the approval on the books o'f his Office. ‘-It is in proof,- that after the decision of the Commissioner *439 against him, Yester frequently declared that he had abandoned the contest. The public land sales, of the lands within the Bastrop claim, .took place on the 16th of June, 1858, after the usual proclamation of the President of the United States, and the usual advertisements had been made. The plaintiff, Ludeling, after Yester informed him he had declined further contest for the pre-emption right, bought the land from Dorcas Dinkgrave for twenty-five hundred dollars, having relocated the warrant on the 7th of December, 1857, after the Commissioner had, decided against Yester’s claim.
In July, 1858, an appeal was taken from the decision of the Commissioner, rendered in September, 1857. The Secretary ordered a reinvestigation of the claim of Yester. The register and receiver, upon the re-examination, reported in favor of it. The Commissioner again decided against it. This decision was reversed by the Secretary of the Interior, and the patent issued in favor of Yester’s heirs, as already stated on the 7th of December, 1859.
By the two acts of Congress, the first approved 3d of March, 1851, the other on the 3d of March, 1853, applicable to the Bastrop grant, the benefits of the act of September 4, 1841, were extended to persons, who, but for the reservation of the lands, would have been entitled to pre-emption rights under that or some other act granting pre-emptions.
The privileges of the act of 1841, being extended to settlers in the Bastrop grant by the act of March 3, 1853, Yester, dating his settlement in 1849, and availing himself of the act of 1841, (as he coidd claim the benefit of no earlier act) was required to fulfil the conditions of that act and those of the act of 1851, which he claimed under. It was incumbent upon him to show that he was a bono fide settler, and an actual housekeeper on the land at the time the public surveys were extended over the same. That he had built a dwelling-house upon the land claimed; that he had made improvements upon it; that he was a man of family, or a single man over twenty-one years of age. He was required to swear that he had not directly or indirectly made any agreement or contract with any person by which the title he might procure from the government should inure to the benefit of any person except himself. He was bound -to consummate his pre-emption by making his affidavit proof, and payment within a year after the filing of the approved plot of survey in -the office of the register of the proper land-office.
At the time Yester settled upon the improvement, he bought within the Bastrop grant — the land embraced by it was not considered public land. It had been treated, previous to the annulment of the grant as private property, by being made the object of sale and taxation. It is not clear, that when he bought the improvement and settled upon the land, it was with the intention of securing a pre-emption upon it, nor that his settlement and occupation come strictly within the spirit and intendment of the pre-emption laws. It is shown that he put up near his dwelling-house a small fabric intended for a kitchen, and that he put in it a bed and a few other articles of furniture, the purpose clearly being to make a show of having built a dwelling-house upon the land. To obviate the difficulty arising from the sale, which we have noticed, he resorted to the scheme of exhibiting at the land-office a reconveyance of *440 the property from -his brother. This was a private act, not placed on record, and purporting to be dated June 1; 1855. A witness to this act, being sworn on the investigation of the claim, stated under cross-examination, that the act had been executed the night before; that is, on the night of September 19, 1856.
On the part of W. J. Vester, on the first examination of his claim, an effort was made to introduce Solomon Vester as a witness, to prove the reconveyance of. the property to W'. Ji Vester, and that Sólomon Vester had no interest in the improvement. The introduction of the witness was objected to, and the objection was sustained. A bill of excéptions was reserved. - Before the reinvestigation canie on; Solomon Vester died. A question arose as to when the extension of the surveys over the lands is to be considered as having taken place; whether, upon the completion of the work in the field, or at the time of the filing the approved plots of survey in the office of the register of the proper land office. We think the instructions of Mr. Butterfield, the Gommissioner of the General Land Office, are sufficiently clear on that point. • In his letter of 17th of April, 1851, to the register and receiver at Monroe, he says: “The period at which the proof is to be filed in your office and the entry consummated, .is any time within a year after such extension of the surveys over the land; a period which this office will take care by instructions to to the Surveyor General shall be sufficiently and plainly shown by the plots he will furnish you of. such surveys.”
It appears that the entries on the margin of the township map, show that the survey of the township was completed in the first quarter of 1855. . The first appearance of Vester, at the land- iffice to make proof, was on the 16th of September; 1856. The township map was filed in the register’s office on the 20th of September, 1856.
It can admit of no doubt whatever from the tenor of the act of 1841, and from the instructions of Mr. Butterfield, the Commissioner, that the time of the completion of the surveys in the field is the period from which the year is to commence. , But as the act of 1853 extends to preemptors the privileges of the act of 1841, it would seem that the preemptor on lands not in market, would be allowed one year from the time of the filing-of the township map. Two classes of lands were subject to pre-emption by the act of 1841; those which were subject to private entry, and which of course had been previously offered at public sale, and those which had been surveyed, but had not been exposed to sale. Pre-emptors on the land, subject to private entry, were required to prove their right and pay for the land within twelve months from the date of their settlements; while those on lands which had not been offered, were allowed twelve months from the time of the filing the plot in the proper land office, unless a public sale of the land should intervene, in which case the proof and payment were required to be made before the sale. Vester was entitled to the privileges accorded to the last-named class of pre-emptors, and it appears that he presented his claim barely within the time allowed.
An effort, and an ineffectual one in our judgment, was made to ward off the effect of the sale of W. J. Vester to Solomon Vester, by showing it to have been simulated. It did not lie with the party to show that his *441 written act, duly entered .upon the public records, was a nullity and a fraud. It is shown that Solomon Vester, under this sale, had the prc - perty assessed in his own name, and that W. J. Vester gave in nothing for assessment, and that he paid only a poll tax. That Solomon Vester exercised ownership over the place; that as late as the 1st of September, 1856, he spoke of the place as his own, ahd that in presence of Ms brother.
Assessments are made under the oath of the party assessed. The year within which W. J. Vester could file his affidavit- and proof,' expired on the 20th of September, 1856. We have seen that he appeared at the land-office on the 16th of that month, and obtained further time, to-wit: to the 19th to complete his proof, and that the completion of it was the production of the fraudulent retransfer from Solomon Vester, proved to have been manufactured the night before. Other witnesses testified to facts, the tendency of which is to show that W. J. Vester was the real owner; but these facts we do not think conclusive, that Solomon Vester had no interest in the things sold. • .
The counsel for the plaintiff insists, that the failure of- Vester to take an appeal from the Commissioner’s decision against him before the land sales cuts off his right altogether, and puts an end to the contest. Wo think this position correct. It is true, that no definite time is fixed by law within which such appeals are required to be taken. But we find, from the general tenor of the pre-emption laws, that persons claiming rights under them are required, within reasonable delays, to establish those rights, and that a failure to do so operates a forfeiture of them. By the act of 1841, the class of pre-emptors, in which Vester was placed, forfeited their pre-emptions, if they failed to establish them before the public land sales occurred. He presented his proofs barely within the year from the filing of the township map in the land-office, at Monroe, viz: on the 20th of September, 1856. The decision of the Commissioner against him was rendered in September, 1857. Notice of this decision was duly forwarded to the local-office, with instructions to notify the parties in interest.
The public land sales commenced on the 16th of June, 1858, and lasted three days. Vester had then from September, 1857, until. June 16, 1858, to take his appeal. The appeal was not taken until the 7th of-July, 1858, near a month after the land sales were over. After.the decision of the Commissioner against him, he declared his intention to abandon the contest; and is not his long delay to appeal to be construed as an acquiescence in the decision? Before the land sales came on, .Dorcas Dink-grave’s land warrant had been relocated, and the list of selected lands approved, by which the title was vested in the State.
If there was no limit to the time of appeals in such cases, the confliction of claims would be endless. If a party were allowed his own time to appeal, a bona fide purchaser at .the public sales, without notice, might be ousted of his land years after he had acquired and improved them.
Under the state of facts presented, a claim open to so many objections, and regarding the validity of which there was such a discrepancy of *442 opinion among-the officers of the-Land-;Department, the'Commissioner of íhe^Geúéhil1 Land'offi¿é¡'having 'twice ‘decided agamst it^' could not, in our view, be decreed a pre-emption right, unless by a strained and unwarranted cohstrucfeoh1 of id w, and against its tenor and spirit.
It'is ’thérófbre'1 ordered, adjudged' and decreed that the judgment of the District Court be affirmed, with costs in both c,ourts.